MICHAEL E. HEYGOOD,
PSC Member/MDL No. 2672-CRB
Texas Bar No. 00784267
CHARLES MILLER,
ESQ./SBN: 276523
**HEYGOOD, ORR & PEARSON**
6363 North State Highway 161
Suite 450
Irving, Texas 75038
Telephone: (214) 237-9001
Facsimile: (214) 237-9002

Admission *Pro Hac Vice* to be Sought for:

ERIC D. PEARSON,
Texas Bar No. 15690472
**HEYGOOD, ORR & PEARSON**
6363 North State Highway 161
Suite 450
Irving, Texas 75038
Telephone: (214) 237-9001
Facsimile: (214) 237-9002

**Attorney for Plaintiffs**

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| MICHAEL BROWN and ANTHONY SALINAS, *et al.* ) ) ) | |
| Plaintiffs ) ) ) | CASE NO. _____ |
| ) | **COMPLAINT AND JURY DEMAND** |
| vs. ) ) | |
| AUDI AG and AUDI OF AMERICA, LLC, ) ) | |
| Defendants. ) | |

## PRELIMINARY STATEMENT

1.     The Plaintiffs (identified below in paragraphs 10-105 infra) bring this Complaint

(the "Complaint") against Defendants Audi AG and Audi of America, LLC ("Defendants" or

"Audi") seeking damages and other relief for Audi's installation of illegal defeat devices on their

vehicles.  Audi installed these "defeat devices" to skirt governmental emissions regulations by fooling the consumers and regulators into believing that the vehicles emitted far less carbon dioxide gas ("$CO_2$") than they emit in real-world driving conditions.

2.     When Plaintiffs purchased or leased their vehicles, they did not know that the vehicles had illegal defeat devices.  Audi designed these defeat devices to clandestinely reduce carbon dioxide emissions and to increase fuel efficiency when the vehicles are being tested for emissions and fuel efficiency.  But when the vehicles are being driven on the road, they emit significantly more $CO_2$ than Audi advertised and more than is allowed by law.

3.     The vehicles containing the illegal $CO_2$ defeat devices include at least those vehicles Audi equipped with (a) a ZF 8HP55 "AL 551" transmission, including, but not limited to, the A6, A7, A8, Q5, and Q7 models and (b) a DL 501-7Q "DL 501" transmission, including, but not limited to, the Audi S4, S5, S6, S7, and S8 models (collectively the "Fraudulent Vehicles").

4.     Audi sold or leased the Fraudulent Vehicles to Plaintiffs by falsely representing that they complied with relevant emissions standards when in normal use.  And Audi concealed—and failed to inform—Plaintiffs that Audi had installed illegal emissions defeat devices on their vehicles.  Audi also falsely represented the fuel efficiency of the Fraudulent Vehicles.

5.     Plaintiffs have sustained damages due to Audi's conduct in secretly installing defeat devices on their vehicles.  If Plaintiffs had known about the defeat devices, they would not have purchased or leased the Fraudulent Vehicles at all.  Or, if Audi had disclosed the existence of the defeat devices and taken the necessary mitigation efforts to make the Fraudulent Vehicles legal to sell, Plaintiffs would have paid significantly less for them.  Plaintiffs overpaid for their

vehicles (which do not provide the performance, fuel efficiency, and cleanliness that Audi advertised) and the value of their vehicles has diminished now that the existence of the defeat devices has been uncovered.

### JURISDICTION AND VENUE

6.     Pursuant to 28 U.S.C. § 1332(d)(11), this Court has jurisdiction over this case because it is a mass action under the Class Action Fairness Act ("CAFA").  This Court has subject matter jurisdiction over this case under CAFA because:  (1) this is a civil action in which the monetary claims of more than 100 plaintiffs are proposed to be tried jointly (2) the Plaintiffs' claims involve common questions of law or fact; (3) the total amount in controversy exceeds $5 million, exclusive of interest and costs; (4) each plaintiff in this lawsuit is seeking more than $75,000, exclusive of interest and costs; and (5) there is minimal diversity because at least one of the plaintiffs is a citizen of a different state than one of the defendants.

7.     Pursuant to 28 U.S.C. § 1331, this Court has also has jurisdiction over this case because each of the Plaintiffs has asserted a claim under the Magnuson - Moss Act seeking damages in excess of $50,000 exclusive of interest and costs (15 U.S.C. §§ 2301, et seq.). Therefore, Plaintiffs' claims arise under the laws of the United States.

8.     The Court has subject matter jurisdiction over this case for the reasons discussed above (*see* discussion *supra*).  This Court also has personal jurisdiction over the Defendants because, at all relevant times, they designed, manufactured, sold, distributed, promoted and placed into the stream of commerce in California numerous Audi automobiles, including the automobiles at issue in this case.  In addition, the fraudulent statements, breaches of contract, and breaches of warranty at issue in this case occurred, in part, in this District.  In addition, the claims at issue in this this case arise, in part, from Audi's contacts with California.  The

Defendants also conduct business in California and the causes of action asserted herein arose from and are connected to purposeful acts taken by Defendants in California.  Audi's contacts with California were continuous and systematic.

9.      Venue is proper in this District because a substantial part of the events and omissions giving rise to Plaintiffs' claims occurred in this District.  Audi has conducted extensive business in this District, including, without limitation, marketing, advertising, selling, and leasing the Fraudulent Vehicles in this district.  The Plaintiffs listed in paragraphs 10-18 below reside in this district and purchased their Fraudulent Vehicles in this District.

## **PARTIES**

### **Plaintiffs**

### **California Plaintiffs**
**Northern District of California Plaintiffs**

10.     Michael Brown is a citizen of California residing in Contra Costa County, California.  Mr. Brown leased a 2015 Audi Q7 from Audi Concord in Concord, California.

11.     Anthony Salinas is a citizen of California residing in Contra Costa County, California.  Mr. Salinas purchased a 2013 Audi A6 from Audi of Oakland in Alameda County, California.

### **Other California Plaintiffs**

12.     Jason Scheiner is a citizen of California residing in San Diego County, California. Mr. Scheiner purchased a used 2013 Audi A6 3.0 gasoline vehicle from Walters Audi in Riverside, Riverside County, California.

13.     Ben Wilkening is a citizen of Arizona residing in Maricopa County, Arizona.  Mr. Wilkening purchased a used 2013 Audi A6 3.0 gasoline vehicle from Mission Viejo Audi in Mission Viejo, California.

14.     Richard Yeadon is a citizen of California residing in San Joaquin County, California.  Mr. Yeadon purchased a new 2014 Audi Q7 3.0 gasoline vehicle and 2012 Audi S5 gasoline vehicle from Desert European Motorcars in Rancho Mirage, California.

15.     Daniel Cuello is a citizen of California residing in Los Angeles County, California.  Mr. Cuello purchased a new 2016 Audi SQ5 3.0 gasoline vehicle from Audi in Valencia, Los Angeles County, California.

16.     Robert Valencia is a citizen of California residing in Los Angeles County, Califonia.  Mr. Valencia purchased a new 2016 Audi S6 4.0 gasoline vehicle from Audi in Valencia, Los Angeles County, California.

17.     Oliver Roncal is a citizen of California residing in San Diego County, California.  Mr. Roncal purchased a new 2014 Audi Q5 3.0 gasoline vehicle from Audi in Escondido, San Diego County, California.

18.     Aaron Alan is a citizen of California residing in Los Angeles County, California.  Mr. Alan purchased a new 2016 Audi A6 3.0 gasoline vehicle from Audi in Pasadena, Los Angeles County, California.

19.     Lacey Miller is a citizen of California residing in San Bernardino County, California.  Ms. Miller purchased a new 2013 Audi S8 4.0 gasoline vehicle from Penske Audi in West Covina, Los Angeles County, California.

20.     Eddie Jones is a citizen of California residing in Los Angeles County, California.  Mr. Jones purchased a used 2013 Audi A8 3.0 gasoline vehicle from Audi Mission Viejo in Mission Viejo, Orange County, California.

**Missouri Plaintiffs**

21.      Plaintiff LeeAnn Avalos is a citizen of Missouri residing in Platte County, Missouri.  Ms. Avalos purchased a used 2015 Audi Q7 3.0 gasoline vehicle from Molle Audi in Kansas City, Jackson County, Missouri.

22.      Plaintiff Harry Baum is a citizen of Missouri residing in Platte County, Missouri.  Mr. Baum's company, Plaintiff KHCA Management, LLC, is a limited liability company organized and existing under the laws of Kansas.  Plaintiff KHCA Management, LLC purchased a 2015 Audi A6 in Missouri.

23.      Plaintiffs Harry Gutshall and Pamela Gutshall are citizens of Missouri residing in Platte County, Missouri.  The Gutshalls purchased a new 2015 Audi Q7 Q7 3.0 gasoline vehicle from Molle Audi in Kansas City, Jackson County, Missouri.

24.      Plaintiff James M. Harrington is a citizen of Kansas residing in Johnson County, Kansas.  Mr. Harrington leased a new 2015 Audi A8 Q7 3.0 gasoline vehicle from Molle Audi in Kansas City, Jackson County, Missouri.

25.      Plaintiff Scott Mattivi is a citizen of Kansas residing in Johnson County, Kansas.  Mr. Mattivi leased a new 2013 Audi A6 Q7 3.0 gasoline vehicle from Molle Audi in Kansas City, Jackson County, Missouri.  Mr. Mattivi's wife, Brenda Mattivi, is a co-owner of the vehicle.

26.      Plaintiffs John Saksa and Sally Saksa are citizens of Missouri residing in Saint Louis County, Missouri.  The Saksas purchased a new 2013 Audi A6 3.0 gasoline vehicle from Audi of Kirkwood in Kirkwood, Saint Louis County, Missouri.

27.     David Wagman is a citizen of Missouri residing in St. Louis County, Missouri. Mr. Wagman leased a new 2015 Audi A8 3.0 gasoline vehicle from Creve Coueur Audi (Plaza Motors) in Creve Coueur, Saint Louis County, Missouri.

28.     Jae and Hyunah Ahn are citizens of Illinois residing in DuPage County, Illinois. The Ahn's purchased a new 2012 Audi Q5 3.0 gasoline vehicle from Reliable Superstore in Springfield, Greene County, Missouri.

## Nebraska Plaintiffs

29.     James Craig is a citizen of Nebraska residing in Webster County, Nebraska.  Mr. Craig leased a 2014 Audi A6 3.0 gasoline vehicle from Baxter Audi in Omaha, Douglas County, Nebraska.

## Nevada Plaintiffs

30.     Alan Mintz and Judy Mintz are a citizens of Nevada residing in Clark County, Nevada.  The Mintzes leased a new 2015 Audi A8 3.0 gasoline vehicle from Henderson Audi in Henderson, Clark County, Nevada.

31.     Derrick Penney is a citizen of Nevada residing in Clark County, Nevada.  Mr. Penney purchased a new 2012 Audi A6 3.0 gasoline vehicle from Desert Audi in Las Vegas, Clark County, Nevada.

32.     Thomas Tait and Katherine Tait are citizens of Nevada residing in Clark County, Nevada.  The Taits purchased a 2013 Audi A6 3.0 gasoline vehicle through the Tait Family Trust.

33.     Sheldon Rayman is a citizen of Nevada residing in Clark County, Nevada.  Mr. Rayman purchased a new 2016 Audi A7 3.0 gasoline vehicle from Audi in Las Vegas, Clark County, Nevada.

34.     Michael DeLaet is a citizen of California residing in San Mateo County, California,  Mr. DeLaet purchased a new 2014 Audi S6 4.0 gasoline vehicle from Audi in Henderson, Clark County, Nevada.

**New Hampshire Plaintiffs**

35.     Michael Turilli is a citizen of New Hampshire residing in Hillsborough County, New Hampshire.  Mr. Turilli purchased a new 2016 Audi S4 3.0 from Audi Nashua in Nashua, Hillsborough County, New Hampshire.

**New Mexico Plaintiffs**

36.     Jenna Martinez is a citizen of New Mexico residing in Bernalillo County.  She purchased a 2015 Audi Q7 3.0 from Audi of Albuquerque in Albuquerque, Bernalillo County, New Mexico.

37.     Rachel Armstrong is a citizen of New Mexico residing in Curry County, New Mexico.  Ms. Armstrong purchased a new 2016 Audi Q5 3.0 gasoline vehicle from Audi in Albuquerque, Bernalillo County, New Mexico.

38.     Eric Coontz is a citizen of New Mexico residing in Bernalillo County, New Mexico.  Mr. Coontz purchased a new 2012 Audi Q5 3.0 gasoline vehicle from Audi in Albuquerque, Bernalillo County, New Mexico.

39.     Todd Graves is a citizen of Oklahoma residing in Oklahoma County, Oklahoma. Mr. Graves purchased a used 2012 Audi A7 3.0 gasoline vehicle from Audi in Albuquerque, Bernalillo County, New Mexico.

**New Jersey Plaintiffs**

40.     Eric J. Boyle is a citizen of Pennsylvania residing in Lehigh County, Pennsylvania.  Mr. Boyle purchased a new 2012 Audi Q7 3.0 gasoline vehicle from Bell Audi in Edison, Middlesex County, New Jersey.

41.     Howard Bregman is a citizen of Florida residing in Palm Beach County, Florida.  Mr. Bregman purchased a used 2014 Audi A8L 4.0 gasoline vehicle from Town Audi in Englewood, Bergen County, New Jersey.

42.     Plaintiffs Joseph Elkhoury and Jovan Elkhoury are citizens of Pennsylvania residing in Monroe County, Pennsylvania.  They purchased a used 2013 Audi S5 from Brogan Cadillac in Totowa, Passaic County, New Jersey.

43.     Maurice Lesser is a citizen of New Jersey residing in Atlantic County, New Jersey.  Mr. Lesser purchased a new 2012 Audi Q5 3.0 gasoline vehicle from Atlantic Chrysler Jeep Audi in Atlantic City, Atlantic County, New Jersey.

44.     Sharlene Martin is a citizen of New York residing in Ulster County, New York.  Ms. Martin purchased a new 2015 Audi Q7 3.0 gasoline vehicle from Jack Daniels Audi in Upper Saddle River, Bergen County, New Jersey.

45.     Gordon Miles and Terri Allen-Miles are citizens of New York residing in New York County, New York.  Ms. Allen-Miles purchased a new 2015 Audi Q7 3.0 gasoline vehicle from Town Motors in Englewood, Bergen County, New Jersey.

46.     Nicholes Kowlahar is a citizen of New Jersey residing in Middlesex, New Jersey.  Mr. Kowlahar purchased a new 2015 Audi Q7 3.0 gasoline vehicle from Bell Audi in Edison, Middlesex County, New Jersey.

47.     Pasquale Pisani is a citizen of New Jersey residing in Hudson County, New Jersey.  Mr. Pisani purchased a used 2012 Audi Q5 3.0 gasoline vehicle from Millburn Audi in Millburn, Essex County, New Jersey.

48.     Gramatas Poulos is a citizen of New York residing in New York County, New York.  Mr. Poulos purchased a new 2015 Audi S5 from Princeton Audi in Princeton, Mercer County, New Jersey.

49.     Rafal Proban is a citizen of New Mexico residing in Santa Fe County, New Mexico.  Mr. Proban purchased a new 2015 Audi S4 3.0 gasoline vehicle from DCH Millburn Audi is Maplewood, Essex County, New Jersey.

50.     Horia Turcu is a citizen of Delaware residing in New Castle County, Delaware.  Mr. Turcu purchased a used 2013 Audi Q7 3.0 gasoline vehicle from Cherry Hill Imports, in Cherry Hill, Camden County, New Jersey.

51.     Thom White is a citizen of New Jersey residing in Monmouth County, New Jersey.  Mr. White purchased a used 2012 Audi A6.

52.     Azemina Fakik is a citizen of New Jersey residing in Bergen County, New Jersey.  Ms. Fakik purchased a used 2012 Audi Q7 3.0 gasoline vehicle from Audi in Bridgewater, Somerset County, New Jersey.

53.     Jesse Decker is a citizen of New Jersey residing in Monmouth County, New Jersey.  Mr. Decker purchased a new 2015 Audi Q7 3.0 gasoline vehicle from Ray Catena Audi in Freehold, Monmouth County, New Jersey.

54.     Linda Novelli is a citizen of New Jersey residing in Atlantic County, New Jersey.  Ms. Novelli purchased a new 2012 Audi A6 3.0 gasoline vehicle from Audi Turnersville in Blackwood, Camden County, New Jersey.

55.     Thomas McGuire is a citizen of New Jersey residing in Monmouth County, New Jersey.  Mr. McGuire purchased a new 2014 Audi S4 3.0 gasoline vehicle from Audi in Mendham, Morris County, New Jersey.

56.     Guido Urzua is a citizen of New Jersey residing in Morris County, New Jersey. Mr. Urzua purchased a new 2015 Audi SQ5 3.0 gasoline vehicle from DCH Millburn Audi in Maplewood, Essex County, New Jersey.

57.     Dianne Estremera is a citizen of New Jersey residing in Union County, New Jersey.  Ms. Estremera purchased a new 2012 Audi Q5 3.0 gasoline vehicle from Town Audi in Englewood, Bergen County, New Jersey.

58.     Stephen Nuzzolo is a citizen of New Jersey residing in Ocean County, New Jersey.  Mr. Nuzzolo purchased a new 2015 Audi S4 3.0 gasoline vehicle from Bell Audi in Edison, Middlesex County, New Jersey.

59.     Ross Pagano is a citizen of New Jersey residing in Ocean County, New Jersey. Mr. Pagano purchased a new 2012 Audi A6 3.0 gasoline vehicle from Audi in Princeton, Mercer County, New Jersey.

60.     Kevin Vo is a citizen of New Jersey residing in Sussex County, New Jersey.  Mr. Vo purchased a used 2013 Audi Q5 3.0 gasoline vehicle from Audi Meadowlands, Hudson County, New Jersey.

61.     Bruce Omstein is a citizen of New Jersey residing in Hudson County, New Jersey. Mr. Omstein purchased a new 2014 Audi S4 4.0 gasoline vehicle from Jack Daniels Audi in Upper Saddle River, Bergen County, New Jersey.

62.     Kanwal Virdi is a citizen of New Jersey residing in Mercer County, New Jersey. Mr. Virdi purchased a new 2014 Audi Q7 3.0 gasoline vehicle from Audi in Edison, Middlesex County, New Jersey.

63.     Sant Bawa is a citizen of New Jersey residing in Monmouth County, New Jersey. Mr. Bawa purchased a new 2012 Audi Q5 3.0 gasoline vehicle from Audi in Eatontown, Monmouth County, New Jersey.

64.     Thomas Dickert is a citizen of New Jersey residing in Camden County, New Jersey.  Mr. Dickert purchased a used 2014 Audi S6 4.0 gasoline vehicle from Manheim Auto Auction in Bordentown, Burlington County, New Jersey.

65.     Jose Zimmerman is a citizen of New York residing in Kings County, New York. Mr. Zimmerman purchased a new 2012 Audi A8 4.0 gasoline vehicle from Richard Catena Auto in Teterboro, Bergen County, New Jersey.

### New York Plaintiffs

66.     Paramveer Bright is a citizen of New York residing in Nassau County, New York. Mr. Bright leased a new 2017 Audi Q7 3.0 gasoline vehicle from Audi of Huntington in Huntington Station, Suffolk County, New York.

67.     Marc Cohen is a citizen of New York residing in Nassau County, New York.  Mr. Cohen leased a new 2014 Audi Q7 3.0 gasoline vehicle from Audi of Lynbrook in Lynbrook, Nassau County, New York.

68.     Armando DeSousa is a citizen of New York residing in Westchester County, New York.  Mr. DeSousa purchased a new 2013 Audi Q5 3.0 gasoline vehicle from Classic Audi in Eastchester, Westchester County, New York.

69.     David Elkouby is a citizen of New York residing in Nassau County, New York. Mr. Elkouby leased a new 2016 Audi A6 3.0 gasoline vehicle from Audi of Brooklyn in Brooklyn, Kings County, New York.

70.     Jeffery Gonzalez is a citizen of New York residing in Queens County, New York. Mr. Gonzalez leased a 2014 Audi S5 from from Audi of Huntington in Huntington Station, Suffolk County, New York.

71.     Daniel Kaplan is a citizen of New York residing in New York County, New York. Mr. Kaplan purchased a new 2012 Audi A6 3.0 gasoline vehicle from Manhattan Audi, Inc. in Manhattan, New York County, New York.

72.     Daniela Kolega is a citizen of New York residing in Nassau County, New York. Ms. Kolega and her husband Gred, Claudio Kolega, leased a new 2014 Audi Q7 3.0 gasoline vehicle from Biener Audi in Great Neck, Nassau County, New York.

73.     Damian Jordan is a citizen of New Jersey residing in Ocean County, New Jersey. Mr. Jordan purchased a used 2013 Audi S4 from Open Road Audi in Manhattan, New York.

74.     LeJuan Moffatt is a citizen of New York residing in Queens County, New York. Mr. Moffatt purchased a new 2013 Audi A63.0 gasoline vehicle from Audi of Manhattan in Manhattan, New York County, New York.

75.     Alex Silverman is a citizen of New York residing in Nassau County, New York. Mr. Silverman leased a new 2015 Audi A6 3.0 gasoline vehicle from Biener Audi in Great Neck, Nassau County, New York.

76.     Jeffrey Vanefsky is a citizen of New York residing in New York County, New York.  Mr. Vanefsky leased a new 2014 Audi A8 in Great Neck, Nassau County, New York.

77.     Helaine Worrell is a citizen of New York residing in Kings County, New York. Ms. Worrell purchased a used 2013 Audi A8 4.0 gasoline vehicle Audi Brooklyn in New York, New York County, New York.

78.     Juliana Zinger is a citizen of New York residing in New York County, New York. Ms. Zinger purchased a new 2017 Audi Q7 3.0 gasoline vehicle from Audi Brooklyn in New York, New York County, New York.

79.     Thomas Ferrara is a citizen of New York residing in Richmond County, New York.  Mr. Ferrara purchased a new 2016 Audi S7 4.0 gasoline vehicle from Audi Manhattan in New York, New York County, New York.

80.     Dariusz Sek is a citizen of New York residing in Queens County, New York.  Mr. Sek purchased a new 2017 Audi Q7 3.0 gasoline vehicle from Audi in Lynbrook, Nassau County, New York.

81.     Jimmy Georgilis is a citizen of New York residing in Suffolk County, New York. Mr. Geogilis purchased a used 2016 Audi A6 3.0 gasoline vehicle from Atlantic Audi in West Islip, Suffolk County, New York.

82.     Neelan Akhtar is a citizen of New York residing in Kings County, New York. Mr. Akhtar purchased a new 2015 Audi Q7 3.0 gasoline vehicle from Audi Manhattan in New York, New York County, New York.

83.     Eriz Yellinek is a citizen of New York residing in Queens County, New York. Mr. Yellinek purchased a new 2014 Audi SQ5 3.0 gasoline vehicle from Biener Audi in Great Neck, Nassau County, New York.

84. Larthonia Redden is a citizen of New York residing in Erie County, New York. Ms. Redden purchased a used 2012 Audi A6 3.0 gasoline vehicle from Northtown Lexus in Amherst, Erie County, New York.

85. Tyrone Butler is a citizen of New York residing in Queens County, New York. Mr. Butler purchased a new 2015 Audi Q7 3.0 gasoline vehicle from Audi in Lynbrook, Nassau County, New York.

86. Baldeep Chawla is a citizen of New York residing in Nassau County, New York. Mr. Chawla purchased a new 2014 Audi S7 4.0 gasoline vehicle from Audi in Lynbrook, Nassau County, New York.

87. Mark Savoye is a citizen of New York residing in Westchester County, New York.  Mr. Savoye purchased a new 2013 Audi S4 3.0 gasoline vehicle from Classic Audi in Eastchester, Westchester County, New York.

88. William Hallett is a citizen of New York residing in Nassau County, New York. Mr. Hallett purchased a new 2013 Audi Q5 3.0 gasoline vehicle from Biene Audi in Great Neck, Nassau County, New York.

89. William Essling is a citizen of New York residing in Nassau County, New York. Mr. Essling purchased a new 2017 Audi Q7 3.0 gasoline vehicle from Audi in Lynbrook, Nassau County, New York.

90. Ekaterini Tsirkas is a citizen of New York residing in Nassau County, New York. Mr. Tsirkas purchased a new 2014 Audi Q5 3.0 gasoline vehicle from Audi in Lynbrook, Nassau County, New York.

91.     John DiBlasi is a citizen of New York residing in Albany County, New York. Mr. DiBlasi purchased a used 2015 Audi S4 3.0 gasoline vehicle from Langan Audi East in Latham, Albany County, New York.

92.     Michael Digiuseppi is a citizen of New York residing in Nassau County, New York.  Mr. Digiuseppi purchased a new 2016 Audi A6 3.0 gasoline vehicle from Biene Audi in Great Neck, Nassau County, New York.

93.     John Flynn is a citizen of New York residing in Suffolk County, New York.  Mr. Flynn purchased a new 2016 Audi S4 3.0 gasoline vehicle from Atlantic Audi in West Islip, Suffolk County, New York.

94.     Alfred Chilampath is a citizen of Pennsylvania residing in Montgomery County, Pennsylvania.  Mr. Chilampath  purchased a used 2013 Audi A6 3.0 gasoline vehicle from Bronx Auto Sales in Bronx, Bronx County, New York.

### North Carolina Plaintiffs

95.     Torre and Cynthia Albritton are citizens of North Carolina residing in Granville County, North Carolina.  The Albritton's purchased 2014 SQ5 gasoline vehicle from Audi of Raleigh in Raleigh, Wake County, North Carolina.

96.     Ajay Gupta is a citizen of North Carolina residing in Cabarrus County, North Carolina.  Mr. Gupta leased a new 2015 Audi A8 3.0 gasoline vehicle from Audi of Charlotte in Charlotte, Mecklenburg County, North Carolina.

97.     David Jaros is a citizen of North Carolina residing in Guilford County, North Carolina.  Mr. Jaros leased a 2015 Audi Q7 3.0 gasoline vehicle from Flow Audi in Greensboro, Guilford County, North Carolina and purchased the vehicle during the lease term.

98.     Christopher Scott is a citizen of North Carolina residing in Mecklenburg County, North Carolina.  Mr. Scott purchased a used 2013 Audi S4 from Audi Northlake in Charlotte, Mecklenburg County, North Carolina.

99.     Ronald Dilorio is a citizen of North Carolina residing in Iredell County, North Carolina.  Mr. Dilorio purchased a new 2014 Audi S5 3.0 gasoline vehicle from Hendrick Audi in Charlotte, Mecklenburg County, North Carolina.

100.    Kal Patel is a citizen of North Carolina residing in Harnett County, North Carolina.  Mr. Patel purchased a new 2012 Audi A6 3.0 gasoline vehicle from Leith Audi in Raleigh, Wake County, North Carolina.

101.    Avery Winder is a citizen of North Carolina residing in Mecklenburg County, North Carolina.  Mr. Winder purchased a used 2012 Audi A7 3.0 gasoline vehicle from Audi in Charlotte, Mecklenburg County, North Carolina.

102.    Doug Cody is a citizen of North Carolina residing in Jackson County, North Carolina.  Mr. Cody purchased a used 2015 Q5 3.0 gasoline vehicle from Harmony Motors in Asheville, Buncombe County, North Carolina.

103.    Nicky Jackson is a citizen of North Carolina residing in Mecklenburg County, North Carolina.  Ms. Jackson purchase a used 2012 Audi A7 3.0 gasoline vehicle from Raleigh Motors in Raleigh, Wake County, North Carolina.

104.    Stephanie Lindsay is a citizen of South Carolina residing in York County, South Carolina.  Ms. Lindsay purchased a new 2012 Audi Q5 3.0 gasoline vehicle from Audi in Charlotte, Mecklenburg County, North Carolina.

105.    Jay Johnson is a citizen of South Carolina residing in Richland County, South Carolina.  Mr. Johnson purchased a used 2012 Audi A8 4.0 gasoline vehicle from Crown BMW in Greensboro, Guilford County, North Carolina.

**Defendants**

106.    Defendant Audi of America, LLC ("Audi America") is a Delaware limited liability company with its principal place of business located at 2200 Ferdinand Porsche Drive, Herndon, Virginia 20171.  Audi America is a citizen of Delaware and Virginia. See 28 U.S.C. § 1332(d)(10).  Audi America is a wholly owned United States subsidiary of Audi AG, and it engages in business, including the advertising, marketing, and sale of Audi automobiles, in all 50 states.

107.    Defendant Audi AG ("Audi AG") is a German corporation with its principal place of business in Ingolstadt, Germany. Audi AG is the parent of Audi of America, LLC and a subsidiary of the Audi Group, which is a wholly owned subsidiary of Volkswagen AG. Audi AG directly controls and directs the actions of Audi of America, LLC. Audi AG designs, develops, manufacturers, and sells luxury automobiles.  According to Audi AG, the Audi Group sold more than 200,000 vehicles in the United States in 2015.

**FACTUAL BACKGROUND**

108.    Audi and its parent company, Volkswagen AG, have a long and sordid history of using defeat devices to falsify emissions test results.  In September 2015,the Environmental Protection Agency ("EPA") and the California Air Resources Board ("CARB") issued notices of violation accusing Volkswagen and Audi of equipping their diesel vehicles with illegal defeat devices to fake passing emissions results on their "Clean Diesel" vehicles. Those defeat devices allowed Volkswagen and Audi's diesel vehicles to detect government testing conditions and

limit nitrous oxide ("NOx") while being tested.  But, during normal driving conditions, the diesel engines emitted NOx well above the legal limits.  Volkswagen and Audi were forced to admit the existence of these defeat devices.  This led to litigation and a multi-billion dollar settlement—one of the largest in U.S. history.  Volkswagen and Audi's conduct also led to criminal prosecutions.  Volkswagen AG pled guild to three criminal felonies and paid a $2.8 billion criminal penalty (on top of substantial civil penalties).

109.    Unfortunately, Audi's use of illegal defeat devices was not limited to diesel vehicles.  In July 2016, CARB discovered that Audi had also secretly installed defeat devices on some of its gasoline vehicles to limit $CO_2$ during emissions testing.   Just like the defeat devices used to falsify NOx emissions on its diesel vehicles, Audi used defeat devices in the Fraudulent Vehicles' to evade U.S. emissions standards.

110.    Audi installed defeat devices in vehicles equipped with one of two automatic transmissions with the internal designations AL 551 and DL 501 through May 2016.  The AL 551 transmission is an eight-speed transmission that Audi sourced from transmission supplier ZF Friedrichshafen (a/k/a ZF).  Audi obtained The DL 501 transmission from Volkswagen. Audi A6, A7, A8, Q5, Q7, S4, S5, S6, S7, and S8 gasoline models are equipped with the AL 551 and DL 501 transmissions that contain the defeat devices at issue in this lawsuit.

111.    Volkswagen and Audi knew that emissions and fuel consumption are critical factors that consumers use to decide what cars to purchase.  Audi told consumers that its vehicles used less fuel and emitted less $CO_2$ than the cars actually do in normal driving conditions.

112.    Audi hid its deception by programming its engines with different modes.  One of these modes—which Audi deceptively called the "warm-up" mode—used significantly less fuel and emitted much less $CO_2$, but also delivered significantly less power.  The "warm up" mode

1   activates when the Fraudulent Vehicles are started.  While the "warm-up" function is on, the

2   automatic transmission remains in a "switching program" that reduces the engine speed,

3   consumes less fuel, and produces less $CO_2$.

4       113.    Audi's use of the "warm up" mode was not limited to start up.  Audi also used

5   this mode to falsify emissions test results. Audi engineers determined that the only time the

6   Fraudulent Vehicles would run continuously with no steering wheel input was during

7   examination in a lab, on a test bed. The vehicles' transmission control modules ("TCM")

8   therefore set "shift points" that allow the vehicles to detect those lab conditions and to produce

9   compliant emission results under those conditions (known by Volkswagen as the "dyno

10  calibration" mode).[1]   Under these static dynamometer lab conditions (a vehicle treadmill), the

11  defeat devices enable the Fraudulent Vehicles to operate in this low power mode.  This low

12  power mode is also known as the "low $CO_2$" program.  It works by causing the Fraudulent

13  Vehicles to shift gears early to artificially lower engine revs and emissions.

14      114.    During normal driving conditions, the transmission computer switches to "road

15  calibration" mode.  In contrast to "low $CO_2$" mode, the "road calibration" mode  gives full power

16  to the driver, resulting in increased fuel consumption and greater $CO_2$ emissions.  The road

17  calibration mode switches on when the driver turns the steering wheel 15 degrees.  That usually

18  happens seconds after a car is started in normal driving conditions.

19      115.    Audi used the defeat devices to deceive governmental authorities and consumers

20  about the Fraudulent Vehicles' true fuel consumption and $CO_2$ emissions.  A vehicle's advertised

---

[1] The defeat device software is part of the TCM.  The TCM is designed to establish shift logic by reacting to signals from sensors monitoring coolant temperature, exhaust  temperature, ignition timing, crankshaft and camshaft positioning, fuel mixture and air flow volumes. The TCM and engine control unit ("ECU") work together to implement the cheating  function. Audi engineers intentionally put the cheat software in the TCM unit to make the defeat device more difficult to detect.

fuel economy (listed on its "Monroney Sticker") is determined by driving a vehicle over five standardized driving patterns (or drive cycles).  These driving patterns are tested in a laboratory on a dynamometer where the conditions for all tests can be controlled.  These driving cycles include cold starts, hot starts, highway driving, aggressive high-speed driving, and driving with the air conditioner in use.  The defeat device software is located in the TCM.  The engineers imbedded the cheat software in the TCM unit, to make it difficult to detect.

116.    The TCM is designed to establish shift logic by responding to signals from sensors monitoring coolant temperature, exhaust temperature, ignition timing, crankshaft and camshaft positioning, fuel mixture and air flow volumes. The TCM and engine control unit ("ECU") work together to cheat on emissions tests. Data from the five drive cycles are combined and adjusted for "real world" conditions in a way to represent "City" driving and "Highway" driving.  The "combined" fuel economy is the average of the City and Highway values with weights of 55% and 45% respectively. These adjusted and combined values appear on the vehicle's Monroney sticker.

117.    The drive cycles are performed on a dynamometer in a lab while the Fraudulent Vehicles' "low $CO_2$" mode is activated.  During each cycle, pollutants are measured.  This includes un-combusted or partially combusted gasoline (hydrocarbons or HC), carbon monoxide (CO) and carbon dioxide ($CO_2$).  The amount of carbon produced is then converted to the amount of gasoline that was required to produce the carbon in the exhaust.  The amount of gasoline produced during the tests is divided into the distance driven on the test to produce the fuel economy.

118.    Mathematically, as the amount of $CO_2$ produced increases, a vehicle gasoline uses more gasoline and the fuel economy decreases. Therefore, if a Defective Vehicle produces less

$CO_2$ during laboratory testing (while in "low $CO_2$" mode) but higher $CO_2$ when driven on the road, then the vehicle would have a higher estimated fuel economy rating on the Monroney sticker than the vehicle would actually have while being driven.

119. This is how Audi's defect devices worked in the Fraudulent Vehicles. The defeat device program gives the Fraudulent Vehicles two modes. The "dyno calibration" mode lowers fuel supply and limits revolutions per minute ("rpms") per gear, which curtails fuel burn and lowers emissions. The "low $CO_2$" or "dyno calibration" mode is activated during all of the laboratory testing used to calculate the Fraudulent Vehicles' supposed fuel economy. On the other hand, the "road calibration" mode allows the engine to turn maximum rpms in each gear and furnishes the necessary—greatly increased—fuel supply required to deliver advertised torque and performance. The "road calibration" mode is active during all normal driving.

120. Audi knew what it was doing. In fact, it commissioned its own study, which found that a vehicles' fuel consumption on the road increased by 8.5 percent after the wheel was turned. Audi executives knew how the defeat device worked, and instructed company employees to utilize it to deceive regulators and consumers. Volkswagen and Audi management discussed the defeat device software in detail, for example, during a "Summer Drive" event in South Africa in the second half of February 2013. According to the event minutes, Axel Eiser, then the head of Audi's powertrain division (and currently the head of powertrain development of the entire Volkswagen group) asked: "When will we have the cycle optimized shift program?" He continued: "The shifting program shall be designed to be 100% active on the dyno, but only 0.01% in the hands of the customer."[2]   The meaning of Mr. Eiser's statement is crystal clear—

---

[2] Kayhan Oezgenc and Jan C. Wehmeyer, *This is How the Manufacturer Cheated on $CO_2$*, Bild am Sonntag (November 5, 2016) http://www.bild.de/bild-plus/auto/auto-news/audi/so-schummelte-der-hersteller-bei-co-48621300.bild.html

Audi executives intentionally used the defeat device to deceive regulators and consumers by activating the "low $CO_2$" or "dyno calibration" mode in testing conditions.  This practice is highly deceptive and illegal.

## TOLLING OF THE STATUTE OF LIMITATIONS

### Discovery Rule Tolling

121.    Plaintiffs could not have discovered through reasonable diligence that their Fraudulent Vehicles were defective within the time period of any applicable statutes of limitation.  Plaintiffs did not know and could not have known until November 7, 2016, the time when published reports first revealed that the Fraudulent Vehicles are equipped with defeat devices.  Plaintiffs' claims did not accrue until they discovered that the defeat device caused the Fraudulent Vehicles to fail required emissions standards.

### Fraudulent Concealment Tolling

122.    At all relevant times, Audi concealed the existence of the defeat devices from Plaintiffs and failed to disclose any information to Plaintiffs about the defeat devices on the Fraudulent Vehicles.  Audi deliberately hid the information that Plaintiffs needed to discover the existence of the defeat devices at an early time using reasonable diligence.  Despite knowing that its vehicles contained illegal defeat devices, Audi continued to manufacture, market, distribute, lease, and/or sell the Fraudulent Vehicles to Plaintiffs.  This conduct amounted to concealment and failure to notify Plaintiffs about any facts that would have alerted Plaintiffs to the existence of the defeat devices on the Fraudulent Vehicles.

123.    Plaintiffs justifiably relied on Audi to disclose these material defects in the Audi vehicles they purchased or leased, as such defects were hidden and not discoverable through reasonable efforts by Plaintiffs.  All applicable statutes of limitation have been tolled and

suspended with respect to Plaintiffs' claims arising from the existence of the defeat devices on the Fraudulent Vehicles by virtue of the fraudulent concealment doctrine.

### Estoppel

124.     Audi was under a continuous duty to disclose to Plaintiffs the existence of the defeat devices.  The existence of the defeat devices has had a substantial, negative effect on the character, quality, performance, and nature of the Fraudulent Vehicles. Audi actively hid the true character, quality, performance, and nature of the defeat device in the Fraudulent Vehicles, and Plaintiffs reasonably relied upon Audi's knowing and active concealment of these facts.  Audi is accordingly estopped from relying on any statute of limitations in defense of this action.  For these same reasons, Audi is estopped from relying upon any warranty mileage and age limitations in defense of this action.

### CLAIMS FOR RELIEF

### COUNTS COMMON TO ALL PLAINTIFFS

### COMMON COUNT 1
### VIOLATION OF MAGNUSON MOSS WARRANTY ACT,
### (15 U.S.C. §§ 2301, *et seq.*)
### (On Behalf of all Plaintiffs)

125.     Plaintiffs incorporate by reference all allegations in this Complaint as though fully set forth herein.

126.     This Court has jurisdiction to decide claims brought under the Magnuson-Moss Warranty Act (for the purpose of this Count, the "Act") by virtue of 28 U.S.C. § 1332(a)-(d).

127.     Defendants are "supplier[s]" and "warrantor[s]" within the meaning of 15 U.S.C. § 2301(4) and (5) because they regularly sell Audi vehicles accompanied by the written Limited Warranties.

128.     Plaintiffs are "consumers" who purchased "consumer products" for purposes of 15 U.S.C. § 2301(1) and (3) because they purchased Fraudulent Vehicles for personal, family, or household purposes.

129.    The Fraudulent Vehicles are "consumer products" within the meaning of the Act. 15 U.S.C. § 2301(1).

130.    The Act provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written or implied warranty.  15 U.S.C. § 2310(d)(1)

131.     The amount in controversy of the Plaintiffs' individual claims meets or exceeds $25.00 in value.  In addition, the amount in controversy meets or exceeds $50,000 in value (exclusive of interest and costs) on the basis of all claims to be determined in this suit.

132.    Under the Act, damaged "consumers" have a private cause of action against any warrantor that fails to comply with a written or implied warranty.

133.    Audi provided Plaintiffs with two express warranties:  (1) "bumper-to-bumper" limited express warranty coverage for a minimum of four years or 50,000 miles, whichever comes first, and which covers emission related repairs; and (2) a federal emissions warranty that covers the repair and replacement of all emission control and emission- related parts for two years or 24,000 miles (whichever comes first), and covers specified major emission control components, including catalytic converters, electronic emissions control unit or computer and on-board emissions diagnostic device or computer for 8 years or 80,000 miles (whichever comes first). These express warranties constitute written warranties within the meaning of 15 U.S.C. § 2301(6).  The Fraudulent Vehicles' implied warranties are covered by 15 U.S.C. § 2301(7).

134.    The terms of the written warranties and implied warranties became part of the basis of the bargain between Plaintiffs when deciding to purchase a Defective Vehicle.

135.     Audi breached these written and implied warranties as described in detail above. Without limitation, the Fraudulent Vehicles share a common design defect in that they emit more carbon dioxide than: (a) is allowable under the applicable regulations, and (b) Audi represented were emitted to their customers, the public, and regulators.

136.     Plaintiffs have had sufficient direct dealings with either Audi or its agents (including Audi dealerships) to establish privity of contract between Audi, on the one hand, and Plaintiffs, on the other hand. Nonetheless, privity is not required here because Plaintiffs are intended third-party beneficiaries of contracts between Audi and its dealers, and specifically, of Audi's implied warranties. The dealers were not intended to be the ultimate consumers of the Fraudulent Vehicles and have no rights under the warranty agreements provided with the Fraudulent Vehicles; the warranty agreements were designed for and intended to benefit the consumers only.

137.     Affording Audi a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here. At the time of sale or lease of each Defective Vehicle, Audi knew, should have known, or was reckless in not knowing of its misrepresentations concerning the Fraudulent Vehicles' inability to perform as warranted, but nonetheless failed to rectify the situation and/or disclose the design defect.  Under the circumstances, the remedies available under any informal settlement procedures would be inadequate and any requirement that Plaintiffs resort to an informal dispute resolution procedure and/or afford Audi a reasonable opportunity to cure its breach of warranties is excused and thereby deemed satisfied.

138.     As a direct and proximate result of Audi's breach of the written warranties and the implied warranty of merchantability, Plaintiffs have suffered damages in an amount to be determined at trial.

139.    Plaintiffs seek all damages permitted by law, including:  compensation for the monetary difference between the Fraudulent Vehicles as warranted and as sold; compensation for the reduction in resale value; the cost of purchasing, leasing, or renting replacement vehicles; other incidental and consequential damages; statutory attorney fees; and all other relief allowed by law.

### COMMON COUNT 2
### FRAUD
### (On Behalf of all Plaintiffs)

140.    Plaintiffs incorporate by reference all allegations in this Complaint as though fully set forth herein.

141.    As alleged above, Defendants intentionally concealed and suppressed material facts concerning the illegality and quality of the Fraudulent Vehicles in order to defraud and mislead both regulators and Plaintiffs about the true nature of the Fraudulent Vehicles. Defendants accomplished their scheme by installing, aiding in the installation of, and/or failing to disclose the defeat devices in the Fraudulent Vehicles that caused the vehicles to operate in a low-emission test mode only during testing. During normal operation and use, the Fraudulent Vehicles emitted significantly larger quantities of carbon dioxide.  The result was precisely what Audi intended— the Fraudulent Vehicles were able to pass emission testing by way of deliberately induced false readings.  Defendants, thus, successfully imported, sold, and/or leased thousands of Fraudulent Vehicles to unwitting American consumers.

142.    Audi falsely represented that the Fraudulent Vehicles had functioning emissions systems that operated within legal limits during normal driving conditions.

143.    Audi's false representations and omissions were material to consumers, as they concerned the legality and marketing features of the Fraudulent Vehicles.

144.    Plaintiffs reasonably relied on Audi's deception, and Audi intended that they would so rely. Plaintiffs had no way of discerning that Defendants were, in fact, deceiving them because the defeat devices were sophisticated technology that could not be discerned by regulators, much less consumers.

145.    Audi's scheme to design and install defeat device software in the Fraudulent Vehicles for the specific purpose of circumventing U.S. law, and then concealing their fraudulent scheme, reveals a corporate culture that emphasized sales and profits over integrity and public health.

146.    Audi had a duty to disclose the defeat devices to regulators and the public.

147.    Audi hatched the deceptive scheme and knew that its customers, including Plaintiffs, did not know about, and could not reasonably discover, its scheme.

148.    Plaintiffs were not aware of the concealed and misrepresented material facts referenced above, and they would not have acted as they did had regulators or the driving public known the truth.

149.    As a direct and proximate result of Audi's fraudulent scheme, Plaintiffs sustained damages.  They own or lease Fraudulent Vehicles that are non-compliant and severely diminished in value as compared to the vehicles that were advertised or marketed. Moreover, the Fraudulent Vehicles either cannot be repaired to comply with applicable emissions standards, or if they can be made compliant, their performance, fuel efficiency, and longevity will be compromised.

150.    Audi is liable to Plaintiffs for damages in an amount to be proven at trial. Moreover, because Audi acted wantonly, maliciously, oppressively, recklessly, deliberately, and with intent to defraud Plaintiffs for the purpose of enriching themselves to Plaintiffs' detriment;

therefore, Audi's conduct warrants substantial punitive and exemplary damages in an amount to be determined at trial.

## COMMON COUNT 3
## BREACH OF CONTRACT
### (On Behalf of all Plaintiffs)

151.    Plaintiffs incorporate by reference all allegations in this Complaint as though fully set forth herein.

152.    Every purchase or lease of a Defective Vehicle from an authorized dealer of Audi constitutes a contract between Audi and the purchaser or lessee. Audi materially breached these contracts by selling or leasing Plaintiffs defective, non-compliant Fraudulent Vehicles and by misrepresenting or failing to disclose the existence of the defeat device, rendering the Fraudulent Vehicles substantially less valuable than the vehicles that the Defendants advertised and promised to deliver to Plaintiffs.

153.    Audi's misrepresentations and omissions alleged herein caused Plaintiffs to enter into their agreements to purchase or lease their Fraudulent Vehicles. Absent those misrepresentations and omissions, Plaintiffs would not have purchased or leased their Fraudulent Vehicles and/or would not have purchased or leased their Fraudulent Vehicles at the prices they paid. Accordingly Plaintiffs overpaid for their Fraudulent Vehicles and did not receive the benefit of their bargain.

154.    Audi also breached their implied covenant of good faith and fair dealing under the laws of all 50 states and the District of Columbia.  By delivering a vehicle that contained defeat device software and thus exceeded, during normal use, federal and state emission limits, Audi violated Plaintiffs' fair and reasonable expectations under their respective contracts.  In addition,

Audi's misrepresentations and omissions violated Audi's implied duty to deal honestly, and within reasonable commercial standards of fair dealing, with Plaintiffs.

155.    As a direct and proximate result of Audi's breach, Plaintiffs have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

**COMMON COUNT 4**
**UNJUST ENRICHMENT**
**(On Behalf of all Plaintiffs)**

156.    Plaintiffs incorporate by reference all allegations in this Complaint as though fully set forth herein.

157.    Audi benefitted from selling and leasing, at an unjust profit, Fraudulent Vehicles that had artificially inflated values due to Audi's concealment of the defeat devices, and Plaintiffs have overpaid for these vehicles.

158.    Audi received and retained unjust benefits from the Plaintiffs and inequity has resulted.

159.    It is inequitable and unconscionable for Audi to retain these benefits.

160.    Because Audi concealed their fraud and deception, Plaintiffs were not aware of the true facts concerning the Fraudulent Vehicles and did not benefit from Audi's misconduct.

161.    Audi knowingly accepted the unjust benefits of their fraudulent conduct.

162.    As a result of Audi's misconduct, the amount of their unjust enrichment should be disgorged and returned to Plaintiffs in an amount to be proven at trial.

## CALIFORNIA COUNTS

### CALIFORNIA COUNT 1
### VIOLATION OF SONG-BEVERLY CONSUMER WARRANTY ACT
### BREACH OF IMPLIED WARRANTY
### (Cal Civ. Code §§ 1790, et seq.)
### (On Behalf of the California Plaintiffs)

163.    Plaintiffs incorporate by reference all allegations in this Complaint as though fully set forth herein.

164.    Plaintiffs who purchased Fraudulent Vehicles in California are "buyers" within the meaning of Cal. Civ. Code § 1791.

165.    The Fraudulent Vehicles are "consumer goods" within the meaning of Cal. Civ. Code § 1791(a).

166.    Audi is the "manufacturer" of the Fraudulent Vehicles within the meaning of Cal. Civ. Code § 1791(j).

167.    Audi impliedly warranted to Plaintiffs that the Fraudulent Vehicles were "merchantable" within the meaning of Cal. Civ. Code §§ 1791.1(a) & 1792; however, the Fraudulent Vehicles do not have the quality that a buyer would reasonably expect.

168.    Cal. Civ. Code § 1791.1(a) states: "Implied warranty of merchantability" or "implied warranty that goods are merchantable" means that the consumer goods meet each of the following:

(1)    Pass without objection in the trade under the contract description.

(2)    Are fit for the ordinary purposes for which such goods are used.

(3)    Are adequately contained, packaged, and labeled.

(4)    Conform to the promises or affirmations of fact made on the container or label.

169.     The Fraudulent Vehicles would not pass without objection in the automotive trade because they share a common design defect in that they are equipped with "defeat devices." These defeat devices are designed to secretly limit emissions and increase fuel efficiency when the vehicles are being subject to regulatory emissions and fuel efficiency testing. However, when the Fraudulent Vehicles are in regular use on the road, they emit a substantially increased amount of noxious gasses.

170.     Fraudulent Vehicles are not adequately labeled because the labeling fails to disclose the fact that they are defective.

171.     In the various channels of information through which Audi sold Fraudulent Vehicles, Audi failed to disclose material information concerning the Fraudulent Vehicles, which it had a duty to disclose. Audi had a duty to disclose the defect because, as detailed above: (a) Audi knew about the defect; (b) Audi had exclusive knowledge of material facts not known to the general public, Plaintiffs, and (c) Audi actively concealed material facts concerning the fact that the Fraudulent Vehicles were equipped with defeat devices from the general public, Plaintiffs. As detailed above, Audi knew the information concerning the defect at the time of advertising and selling the Fraudulent Vehicles, all of which was intended to induce consumers to purchase the Fraudulent Vehicles.

172.     Audi breached the implied warranty of merchantability by manufacturing and selling Fraudulent Vehicles that are defective.  Furthermore, this defect has caused Plaintiffs to not receive the benefit of their bargain and have caused the Fraudulent Vehicles to depreciate in value.

173.     Plaintiffs have been damaged as a result of the diminished value of Audi's products.

174.    Under Cal. Civ. Code §§ 1791.1(d) & 1794, are entitled to damages and other legal and equitable relief including, at their election, the purchase price of their Fraudulent Vehicles, or the overpayment or diminution in value of their Fraudulent Vehicles.

175.    Under Cal. Civ. Code § 1794, Plaintiffs are entitled to costs and attorneys' fees.

**CALIFORNIA COUNT 2**
**VIOLATION OF THE SONG-BEVERLY CONSUMER PROTECTION ACT,**
**BREACH OF EXPRESS WARRANTY**
**Cal Civ. Code §§ 1790, *et seq*.**
**(On Behalf of the California Plaintiffs)**

176.    Plaintiffs incorporate by reference all allegations in this Complaint as though fully set forth herein.

177.    Plaintiffs who purchased or leased the Fraudulent Vehicles in California are "buyers" within the meaning of California Civil Code § 1791(b).

178.    The Fraudulent Vehicles are "consumer goods" within the meaning of California Civil Code § 1791(a).

179.    Audi is a "manufacturer" of the Fraudulent Vehicles within the meaning of California Civil Code § 1791(j).

180.    Audi made express warranties to Plaintiffs within the meaning of California Civil Code §§ 1791.2 and 1793.2, as described above.

181.    As set forth above in detail, the Fraudulent Vehicles are inherently defective in that they are equipped with "defeat devices." These defeat devices are designed to secretly limit emissions and increase fuel efficiency when the vehicles are being subject to regulatory emissions and fuel efficiency testing. However, when the Fraudulent Vehicles are in regular use on the road, they emit a substantially increased amount of noxious gasses. The installation of the

-33-

defeat device substantially impairs the use and value of the Fraudulent Vehicles to reasonable consumers.

182.   As a result of Audi's breach of their express warranties, Plaintiffs received goods whose defect substantially impairs their value to Plaintiffs.  Plaintiffs have been damaged as a result of, inter alia, the diminished value of Audi's products.

183.   Pursuant to California Civil Code §§ 1793.2 & 1794, Plaintiffs are entitled to damages and other legal and equitable relief including, at their election, the purchase price of their Fraudulent Vehicles, or the overpayment or diminution in value of their Fraudulent Vehicles.

184.   Pursuant to California Civil Code § 1794, Plaintiffs are entitled to costs and attorneys' fees.

**CALIFORNIA COUNT 3**
**VIOLATION OF CALIFORNIA CONSUMERS LEGAL REMEDIES ACT**
**Cal Bus. & Prof. Code §§ 1750, *et seq*.**
**(On Behalf of the California Plaintiffs)**

185.   Plaintiffs incorporate by reference all allegations in this Complaint as though fully set forth herein.

186.   Plaintiffs were deceived by Audi's failure to disclose that the Fraudulent Vehicles share a uniform defect in that they are equipped with "defeat devices."  These defeat devices are designed to secretly limit emissions and increase fuel efficiency when the vehicles are being subject to regulatory emissions and fuel efficiency testing. However, when the Fraudulent Vehicles are in regular use on the road, they emit a substantially increased amount of noxious gasses.

187.    Audi engaged in unfair or deceptive acts or practices when, in the course of its business it, among other acts and practices, knowingly made materially incomplete representations as to the characteristics, uses and benefits of the Fraudulent Vehicles.

188.    In the various channels of information through which Audi sold Fraudulent Vehicles, Audi failed to disclose material information concerning the Fraudulent Vehicles, which it had a duty to disclose. Audi had a duty to disclose the defect because, as detailed above, (a) Audi knew about the defeat device equipped on the Fraudulent Vehicles; (b) Audi had exclusive knowledge of material facts not known to the general public, Plaintiffs, and (c) Audi actively concealed material facts concerning the defeat device from the general public, Plaintiffs. As detailed above, Audi knew the information concerning the defect at the time of advertising and selling the Fraudulent Vehicles, all of which was intended to induce consumers to purchase the Fraudulent Vehicles.

189.    Audi intended for the Plaintiffs to rely on it to provide adequately designed, and adequately manufactured automobiles and to honestly and accurately reveal the problems described throughout this Complaint.

190.    Audi intentionally failed or refused to disclose the defect to consumers.

191.    Audi's conduct and deceptive omissions were intended to induce Plaintiffs to believe that the Fraudulent Vehicles were adequately designed and adequately manufactured automobiles.

192.    Audi's conduct constitutes unfair acts or practices as defined by the California Consumers Legal Remedies Act (the "CLRA").

193.    Plaintiffs have suffered injury in fact and actual damages resulting from Audi's material omissions because they paid inflated purchase prices for the Fraudulent Vehicles.

194.     Plaintiffs seek an order enjoining Audi's unfair or deceptive acts or practices, equitable relief, an award of attorneys' fees and costs under Cal. Civ. Code § 1780(e), and any other just and proper relief available under the CLRA.

195.     In accordance with section 1782(a) of the CLRA, Plaintiffs' counsel, on behalf of Plaintiffs, will serve Audi with notice of their alleged violations of Cal. Civ. Code § 1770(a) relating to the Fraudulent Vehicles purchased by Plaintiffs, and demand that Audi corrects or agrees to correct the actions described therein within thirty (30) days of such notice.  If Audi fails to do so, Plaintiffs will amend this Complaint as of right (or otherwise seek leave to amend the Complaint) to include compensatory and monetary damages to which Plaintiffs are entitled.

196.     Audi's conduct described herein is fraudulent, wanton, and malicious.

## MISSOURI COUNTS
### MISSOURI COUNT 1
### VIOLATIONS OF MISSOURI MERCHANDISING PRACTICES ACT
#### (Mo. Rev. Stat. § 407.010, et seq.)
#### (On Behalf of the Missouri Plaintiffs)

197.     Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

198.     Audi and Plaintiffs are "persons" within the meaning of MO. REV. STAT. § 407.010(5).

199.     Audi engaged in "trade" or "commerce" in the State of Missouri within the meaning of Mo. Rev. Stat. § 407.010(7).

200.     The Missouri Merchandising Practices Act ("Missouri MPA") makes unlawful the "act, use or employment by any person of any deception, fraud, false pretense, misrepresentation, unfair practice, or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise Mo. Rev. Stat. § 407.020.

201.    In the course of their business, Audi concealed and suppressed material facts concerning the Fraudulent Vehicles.  Audi accomplished this by installing illegal defeat device software in the Fraudulent Vehicles that caused the vehicles to operate in a low emission test mode only during emissions testing.  During normal operations, the Fraudulent Vehicles would emit grossly larger quantities of noxious $CO_2$ gasses.  The result was what Audi intended—the Fraudulent Vehicles passed emissions testing by way of deliberately induced false readings. Plaintiffs had no way of discerning that Audi's representations were false and misleading because Audi's defeat device software was extremely sophisticated technology. Plaintiffs did not and could not unravel Audi's deception on their own.

202.    Audi's failure to disclose the existence of the defeat device and the true $CO_2$ emissions and mileage of the Fraudulent Vehicles, amounts to misleading statements pursuant to 15 Mo. Code of State Reg. § 60-9.090.

203.    Because Audi knew or believed that its statements about its vehicles' $CO_2$ emissions and mileage were not in accord with the facts and/or had no reasonable basis for such statements in light of its knowledge of these defects, Audi engaged in fraudulent misrepresentations pursuant to 15 Mo. Code of State Reg. 60-9.100.

204.    Audi's conduct as described herein is unethical, oppressive, or unscrupulous and/or it presented a risk of substantial injury to consumers. Such acts are unfair practices in violation of 15 Mo. Code of State Reg. 60-8.020.

205.    Audi knew or should have known that its conduct violated the Missouri MPA.

206.    Audi owed Plaintiffs a duty to disclose illegality, public health and safety risks, the true nature of the Fraudulent Vehicles and the devaluing of safety at Audi, because Audi:

a.    possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not comply with regulations;

b.    intentionally concealed the foregoing from regulators and Plaintiffs,; and/or

c.    made incomplete representations about the environmental cleanliness and efficiency of the Fraudulent Vehicles generally, and the use of the defeat device in particular, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

207.    Audi's fraudulent use of the "defeat device" and its concealment of the true characteristics of the Fraudulent Vehicles' fuel consumption of $CO_2$ emissions were material to Plaintiffs.

208.    Audi's unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including Plaintiffs.

209.    Plaintiffs suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and its concealment of and failure to disclose material information. Plaintiffs who purchased or leased the Fraudulent Vehicles would not have purchased or leased them at all and/or—if the Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them. Plaintiffs also suffered diminished value of their vehicles, as well as lost or diminished use

210.    Audi's violations present a continuing risk to Plaintiffs as well as to the general public.  Audi's unlawful acts and practices complained of herein affect the public interest.

211.    As a direct and proximate result of  Audi's violations of the Missouri MPA, Plaintiffs have suffered injury-in-fact and/or actual damage.

212.    Audi is liable to Plaintiffs for damages in amounts to be proven at trial, including attorneys' fees, costs, and punitive damages, as well as injunctive relief enjoining Audi's unfair and deceptive practices, and any other just and proper relief under Mo. Rev. Stat. § 407.025.

-38-

**MISSOURI COUNT 2**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**(Mo. Stat. §§ 400.2-314 and 400.2A-212)**
**(On Behalf of the Missouri Plaintiffs)**

213.    Plaintiffs re-allege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

214.    Audi is and was at all relevant times a "merchant" with respect to motor vehicles under Mo. Stat. § 400.2-104(1) and a "seller" of motor vehicles under § 400.2-103(1)(d).

215.    With respect to leases, Audi is and was at all relevant times a "lessor" of motor vehicles under Mo. Stat. § 400.2A-103(1)(p).

216.    Fraudulent Vehicles are and were at all relevant times "goods" within the meaning of Mo. Stat. § 400.2-105(1) and Mo. Stat. § 400.2A-103(1)(h).

217.    A warranty that the Fraudulent Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Mo. Stat. § 400.2-314 and Mo. Stat. § 400.2A-212.

218.    The Fraudulent Vehicles were not in merchantable condition and were not fit for ordinary vehicles are used because they share a common defect in that they are equipped with defeat devices.  These defeat devices are designed to secretly limit emissions and increase fuel efficiency when the vehicles are being subject to regulatory emissions and fuel efficiency testing. However, when the Fraudulent Vehicles are in regular use on the road, they emit a substantially increased amount of noxious gasses.

219.    As a direct and proximate result of Audi's breach of the implied warranty of merchantability, Plaintiffs have been damaged in an amount to be proven at trial.

**MISSOURI COUNT 3**
**BREACH OF EXPRESS WARRANTY**
**(Mo. Stat. §§ 400.2-313 and 400.2A-210)**
**(On Behalf of the Missouri Plaintiffs)**

220.   Plaintiffs re-allege and incorporate by reference all preceding allegations as though fully set forth herein.

221.   Audi is and was at all relevant times a "merchant" with respect to motor vehicles under Mo. Stat. § 400.2-104(1) and a "seller" of motor vehicles under § 400.2-103(1)(d).

222.   With respect to leases, Audi is and was at all relevant times a "lessor" of motor vehicles under Mo. Stat. § 400.2A-103(1)(p).

223.   The Fraudulent Vehicles are and were at all relevant times "goods" within the meaning of Mo. Stat. § 400.2-105(1) and Mo. Stat. § 400.2A-103(1)(h).

224.   As set forth above in detail, the Fraudulent Vehicles are inherently defective in that they are equipped with "defeat devices."  These defeat devices are designed to secretly limit emissions and increase fuel efficiency when the vehicles are being subject to regulatory emissions and fuel efficiency testing. However, when the Fraudulent Vehicles are in regular use on the road, they emit a substantially increased amount of noxious gasses.  The installation of the defeat device substantially impairs the use and value of the Fraudulent Vehicles to reasonable consumers.

225.   As a result of Audi's breach of their express warranties, Plaintiffs received goods whose defect substantially impairs their value to Plaintiffs.  Plaintiffs have been damaged as a result of, inter alia, the diminished value of Audi's products.

226.   As a direct and proximate result of Audi's breach of express warranties, Plaintiffs have been damaged in an amount to be determined at trial.

-40-

**NEBRASKA COUNTS**

**NEBRASKA COUNT 1**
**VIOLATIONS OF THE NEBRASKA CONSUMER PROTECTION ACT**
**(Neb. Rev. Stat. § 59-1601, et seq.)**
**(On Behalf of the Nebraska Plaintiffs)**

227.    Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

228.    Audi and Plaintiffs are "person[s]" under the Nebraska Consumer Protection Act ("Nebraska CPA"), Neb. Rev. Stat. § 59-1601(1).

229.    Audi's actions as set forth herein occurred in the conduct of trade or commerce as defined under Neb. Rev. Stat. § 59-1601(2).

230.    The Nebraska CPA prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce." Neb. Rev. Stat. § 59-1602. The conduct of Audi, as set forth herein, constitutes unfair or deceptive acts or practices.

231.    In the course of their business, Audi concealed and suppressed material facts concerning the Fraudulent Vehicles.  Audi accomplished this by installing illegal defeat device software in the Fraudulent Vehicles that caused the vehicles to operate in a low emission test mode only during emissions testing.  During normal operations, the Fraudulent Vehicles would emit grossly larger quantities of noxious $CO_2$ gasses.  The result was what Audi intended—the Fraudulent Vehicles passed emissions testing by way of deliberately induced false readings. Plaintiffs had no way of discerning that Audi's representations were false and misleading because Audi's defeat device software was extremely sophisticated technology. Plaintiffs did not and could not unravel Audi's deception on their own.

232.    Audi thus violated the Act by, at minimum: employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material

fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Fraudulent Vehicles.

233.    Audi intentionally and knowingly misrepresented material facts regarding the Fraudulent Vehicles with intent to mislead Plaintiffs.

234.    Audi knew or should have known that its conduct violated the Nebraska CPA.

235.    Audi owed Plaintiffs a duty to disclose illegality, public health and safety risks, the true nature of the Fraudulent Vehicles and the devaluing of safety at Audi, because Audi:

   a.    possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not comply with regulations;

   b.    intentionally concealed the foregoing from regulators and Plaintiffs,; and/or

   c.    made incomplete representations about the environmental cleanliness and efficiency of the Fraudulent Vehicles generally, and the use of the defeat device in particular, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

236.    Audi's fraudulent use of the "defeat device" and its concealment of the true characteristics of the Fraudulent Vehicles' fuel consumption of $CO_2$ emissions were material to Plaintiffs.

237.    Audi's unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including Plaintiffs.

238.    Plaintiffs suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and its concealment of and failure to disclose material information. Plaintiffs who purchased or leased the Fraudulent Vehicles would not have purchased or leased them at all and/or—if the Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them. Plaintiffs also suffered diminished value of their vehicles, as well as lost or diminished use.

239.    Audi's violations present a continuing risk to Plaintiffs as well as to the general public.  Audi's unlawful acts and practices complained of herein affect the public interest.

240.    As a direct and proximate result of Audi's violations of the Nebraska CPA, Plaintiffs have suffered injury-in-fact and/or actual damage.

241.    Because Audi's conduct caused injury to Plaintiff's property through violations of the Nebraska CPA, Plaintiffs seek recovery of actual damages, as well as enhanced damages up to $1,000, an order enjoining Audi's unfair or deceptive acts and practices, costs of Court, reasonable attorneys' fees, and any other just and proper relief available under Neb. Rev. Stat. § 59-1609.

## NEBRASKA COUNT 2
## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (Neb. Rev. St. U.C.C. §§ 2-314 and 2A-212)
### (On Behalf of the Nebraska Plaintiffs)

242.    Plaintiffs re-allege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

243.    Audi is and was at all relevant times a "merchant" with respect to motor vehicles under Neb. Rev. St. U.C.C. § 2-104(1) and a "seller" of motor vehicles under § 2-103(1)(d).

244.    With respect to leases, Audi is and was at all relevant times a "lessor" of motor vehicles under Neb. Rev. St. U.C.C. § 2A-103(1)(p).

245.    The Fraudulent Vehicles are and were at all relevant times "goods" within the meaning of Neb. Rev. St. U.C.C. §§ 2-105(1) and 2A-103(1)(h).

246.    A warranty that the Fraudulent Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Neb. Rev. St. U.C.C.§§ 2-314 and 2A-212.

247.    The Fraudulent Vehicles were not in merchantable condition and were not fit for ordinary vehicles are used because they share a common defect in that they are equipped with defeat devices.  These defeat devices are designed to secretly limit emissions and increase fuel efficiency when the vehicles are being subject to regulatory emissions and fuel efficiency testing. However, when the Fraudulent Vehicles are in regular use on the road, they emit a substantially increased amount of noxious gasses.

248.    As a direct and proximate result of Audi's breach of the implied warranty of merchantability, Plaintiffs have been damaged in an amount to be proven at trial.

**NEBRASKA COUNT 3**
**BREACH OF EXPRESS WARRANTY**
**(Neb.Rev.St. U.C.C. §§ 2-313 and 2A-210)**
**(On Behalf of the Nebraska Plaintiffs)**

249.    Plaintiffs re-allege and incorporate by reference all preceding allegations as though fully set forth herein.

250.    Audi is and was at all relevant times a "merchants" with respect to motor vehicles under Neb. Rev. St. U.C.C. § 2-104(1) and a "seller" of motor vehicles under § 2-103(1)(d).

251.    With respect to leases, the Defendants are and were at all relevant times "lessors" of motor vehicles under Neb.Rev.St. U.C.C. § 2A-103(1)(p).

252.    The Fraudulent Vehicles are and were at all relevant times "goods" within the meaning of Neb. Rev. St. U.C.C. §§ 2-105(1) and 2A-103(1)(h).

253.    As set forth above in detail, the Fraudulent Vehicles are inherently defective in that they are equipped with "defeat devices."  These defeat devices are designed to secretly limit emissions and increase fuel efficiency when the vehicles are being subject to regulatory emissions and fuel efficiency testing. However, when the Fraudulent Vehicles are in regular use on the road, they emit a substantially increased amount of noxious gasses.  The installation of the

defeat device substantially impairs the use and value of the Fraudulent Vehicles to reasonable consumers.

254.    As a result of Audi's breach of their express warranties, Plaintiffs received goods whose defect substantially impairs their value to Plaintiffs.  Plaintiffs have been damaged as a result of, inter alia, the diminished value of Audi's products.

255.    As a direct and proximate result of Audi's breach of express warranties, Plaintiffs have been damaged in an amount to be determined at trial.

## **NEVADA COUNTS**

### **NEVADA COUNT 1**
### **VIOLATIONS OF THE NEVADA DECEPTIVE TRADE PRACTICES ACT**
#### **(Nev. Rev. Stat. § 598.0903, et seq.)**
#### **(On Behalf of the Nevada Plaintiffs)**

256.    Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

257.    The Nevada Deceptive Trade Practices Act ("Nevada DTPA"), NEV. REV. STAT. § 598.0903, et seq. prohibits deceptive trade practices.  NEV. REV. STAT. § 598.0915 provides that a person engages in a "deceptive trade practice" if, in the course of business or occupation, the person: "5. Knowingly makes a false representation as to the characteristics, ingredients, uses, benefits, alterations or quantities of goods or services for sale or lease or a false representation as to the sponsorship, approval, status, affiliation or connection of a person therewith"; "7. Represents that goods or services for sale or lease are of a particular standard, quality or grade, or that such goods are of a particular style or model, if he or she knows or should know that they are of another standard, quality, grade, style or model"; "9.  Advertises goods or services with intent not to sell or lease them as advertised"; or "15.  Knowingly makes any other false representation in a transaction."

258.    In the course of its business, Audi concealed and suppressed material facts concerning the Fraudulent Vehicles.  Defendants accomplished this by installing illegal defeat device software in the Fraudulent Vehicles that caused the vehicles to operate in a low emission test mode only during emissions testing.  During normal operations, the Fraudulent Vehicles would emit grossly larger quantities of noxious $CO_2$ gasses.  The result was what Audi intended—the Fraudulent Vehicles passed emissions testing by way of deliberately induced false readings. Plaintiffs had no way of discerning that Audi's representations were false and misleading because Audi's defeat device software was extremely sophisticated technology. Plaintiffs did not and could not unravel Audi's deception on their own.

259.    Audi thus violated the Act by, at minimum: employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Fraudulent Vehicles.

260.    Audi intentionally and knowingly misrepresented material facts regarding the Fraudulent Vehicles with intent to mislead Plaintiffs.

261.    Audi knew or should have known that its conduct violated the Nevada DTPA CFA.

262.    Audi owed Plaintiffs a duty to disclose illegality, public health and safety risks, the true nature of the Fraudulent Vehicles and the devaluing of safety at Audi, because Audi:

   a. possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not comply with regulations;

   b. intentionally concealed the foregoing from regulators and Plaintiffs,; and/or

   c.  made incomplete representations about the environmental cleanliness and efficiency of the Fraudulent Vehicles generally, and the use of the defeat device in

particular, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

263.    Audi's fraudulent use of the "defeat device" and its concealment of the true characteristics of the Fraudulent Vehicles' fuel consumption of $CO_2$ emissions were material to Plaintiffs.

264.     Audi's unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including Plaintiffs.

265.    Plaintiffs suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and its concealment of and failure to disclose material information. Plaintiffs who purchased or leased the Fraudulent Vehicles would not have purchased or leased them at all and/or—if the Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them. Plaintiffs also suffered diminished value of their vehicles, as well as lost or diminished use.

266.    As a direct and proximate result of Defendants' violations of the Nevada DTPA,

267.    Plaintiffs have suffered injury-in-fact and/or actual damage.

268.    Defendants' violations present a continuing risk to Plaintiffs as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

269.    As a direct and proximate result of Defendants' violations of the Nevada DTPA, Plaintiffs have suffered injury-in-fact and/or actual damage.

270.    Accordingly, Plaintiffs seek their actual damages, punitive damages, an order enjoining Audi's deceptive acts or practices, costs of Court, attorney's fees, and all other appropriate and available remedies under the Nevada Deceptive Trade Practices Act.  NEV. REV. STAT. § 41.600.

**NEVADA COUNT 2**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**(N.R.S. §§ 104.2314 and 104A.2212)**
**(On Behalf of the Nevada Plaintiffs)**

271.     Plaintiffs re-allege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

272.     The Defendants are and were at all relevant times "merchants" with respect to motor vehicles under N.R.S. § 104.2104(1) and "sellers" of motor vehicles under § 104.2103(1)(c).

273.     With respect to leases, the Defendants are and were at all relevant times "lessors" of motor vehicles under N.R.S. § 104A.2103(1)(p).

274.     The Fraudulent Vehicles are and were at all relevant times "goods" within the meaning of N.R.S. §§ 104.2105(1) and 104A.2103(1)(h).

275.     A warranty that the Fraudulent Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to N.R.S. §§ 104.2314 and 104A.2212.

276.     The Fraudulent Vehicles were not in merchantable condition and were not fit for ordinary vehicles are used because they share a common defect in that they are equipped with defeat devices.  These defeat devices are designed to secretly limit emissions and increase fuel efficiency when the vehicles are being subject to regulatory emissions and fuel efficiency testing. However, when the Fraudulent Vehicles are in regular use on the road, they emit a substantially increased amount of noxious gasses.

277.     As a direct and proximate result of Audi's breach of the implied warranty of merchantability, Plaintiffs have been damaged in an amount to be proven at trial.

**NEVADA COUNT 3**
**BREACH OF EXPRESS WARRANTY**
**(N.R.S. §§ 104.2313 and 104A.2210)**
**(On Behalf of the Nevada Plaintiffs)**

278.     Plaintiffs re-allege and incorporate by reference all preceding allegations as though fully set forth herein.

279.     The Defendants are and were at all relevant times "merchants" with respect to motor vehicles under N.R.S. § 104.2104(1) and "sellers" of motor vehicles under § 104.2103(1)(c).

280.     With respect to leases, the Defendants are and were at all relevant times "lessors" of motor vehicles under N.R.S. § 104A.2103(1)(p).

281.     The Fraudulent Vehicles are and were at all relevant times "goods" within the meaning of N.R.S. §§ 104.2105(1) and 104A.2103(1)(h).

282.     As set forth above in detail, the Fraudulent Vehicles are inherently defective in that they are equipped with "defeat devices."  These defeat devices are designed to secretly limit emissions and increase fuel efficiency when the vehicles are being subject to regulatory emissions and fuel efficiency testing. However, when the Fraudulent Vehicles are in regular use on the road, they emit a substantially increased amount of noxious gasses.  The installation of the defeat device substantially impairs the use and value of the Fraudulent Vehicles to reasonable consumers.

283.     As a result of Audi's breach of their express warranties, Plaintiffs received goods whose defect substantially impairs their value to Plaintiffs.  Plaintiffs have been damaged as a result of, inter alia, the diminished value of Audi's products.

284.     As a direct and proximate result of Audi's breach of express warranties, Plaintiffs have been damaged in an amount to be determined at trial.

## NEW HAMPSHIRE COUNTS

**NEW HAMPSHIRE COUNT 1**
**VIOLATIONS OF N.H. CONSUMER PROTECTION ACT**
**(N.H. Rev. Stat. Ann. § 358-a:1, et seq.)**
**(On Behalf of the New Hampshire Plaintiffs)**

285.    Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

286.    Plaintiffs and Defendants are "persons" under the New Hampshire Consumer Protection Act ("New Hampshire CPA"), N.H. Rev. Stat. § 358-A:1.

287.    Audi's actions as set forth herein occurred in the conduct of trade or commerce as defined under N.H. Rev. Stat. § 358-A:1.

288.    The New Hampshire CPA prohibits a person, in the conduct of any trade or commerce, from using "any unfair or deceptive act or practice," including "but … not limited to, the following: … (V) Representing that goods or services have … characteristics, … uses, benefits, or quantities that they do not have;" "(VII) Representing that goods or services are of a particular standard, quality, or grade, … if they are of another;" and "(IX) Advertising goods or services with intent not to sell them as advertised." N.H. Rev. Stat. § 358-A:2.

289.    In the course of its business, Audi concealed and suppressed material facts concerning the Fraudulent Vehicles.  Defendants accomplished this by installing illegal defeat device software in the Fraudulent Vehicles that caused the vehicles to operate in a low emission test mode only during emissions testing.  During normal operations, the Fraudulent Vehicles would emit grossly larger quantities of noxious $CO_2$ gasses.  The result was what Audi intended—the Fraudulent Vehicles passed emissions testing by way of deliberately induced false readings. Plaintiffs had no way of discerning that Audi's representations were false and

misleading because Audi's defeat device software was extremely sophisticated technology. Plaintiffs did not and could not unravel Audi's deception on their own.

290.    Audi thus violated the Act by, at minimum: employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Fraudulent Vehicles.

291.    Audi intentionally and knowingly misrepresented material facts regarding the Fraudulent Vehicles with intent to mislead Plaintiffs.

292.    Audi knew or should have known that its conduct violated the New Hampshire CPA.

293.    Audi owed Plaintiffs a duty to disclose illegality, public health and safety risks, the true nature of the Fraudulent Vehicles and the devaluing of safety at Audi, because Audi:

   a.  possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not comply with regulations;

   b.  intentionally concealed the foregoing from regulators and Plaintiffs,; and/or

   c.   made incomplete representations about the environmental cleanliness and efficiency of the Fraudulent Vehicles generally, and the use of the defeat device in particular, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

294.    Audi's fraudulent use of the "defeat device" and its concealment of the true characteristics of the Fraudulent Vehicles' fuel consumption of $CO_2$ emissions were material to Plaintiffs.

295.     Audi's unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including Plaintiffs.

296.    Plaintiffs suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and its concealment of and failure to disclose material information. Plaintiffs who purchased or leased the Fraudulent Vehicles would not have purchased or leased them at all and/or—if the Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them. Plaintiffs also suffered diminished value of their vehicles, as well as lost or diminished use.

297.    As a direct and proximate result of Defendants' violations of the New Hampshire CPA, Plaintiffs have suffered injury-in-fact and/or actual damage.

298.    Because Audi's willful conduct caused injury to Plaintiffs' property through violations of the New Hampshire CPA, the Plaintiffs' seeks recovery of actual damages or $1,000, whichever is greater, treble damages, costs and reasonable attorneys' fees, an order enjoining Audi's unfair and/or deceptive acts and practices, and any other just and proper relief under N.H. REV. STAT. § 358-A:10.

299.    Plaintiffs also seek an order enjoining Defendants' unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under the New Hampshire CPA.

**NEW HAMPSHIRE COUNT 2**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**(N.H. Rev. Stat. §§ 382-A:2-314 and 382-A:2A-212)**
**(On Behalf of the New Hampshire Plaintiffs)**

300.    Plaintiffs re-allege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

301.    The Defendants are and were at all relevant times "merchants" with respect to motor vehicles under N.H. Rev. Stat. § 382-A:2-104(1) and "sellers" of motor vehicles under § 382-A:2-103(1)(d).

302.    With respect to leases, the Defendants are and were at all relevant times "lessors" of motor vehicles under N.H. Rev. Stat. § 382-A:2A-103(1)(p).

303.    The Fraudulent Vehicles are and were at all relevant times "goods" within the meaning of N.H. Rev. Stat. §§ 382-A:2-105(1) and 382-A:2A-103(1)(h).

304.    A warranty that the Fraudulent Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to N.H. Rev. Stat. §§ 382-A:2-314 and 382-A:2A-212.

305.    The Fraudulent Vehicles were not in merchantable condition and were not fit for ordinary vehicles are used because they share a common defect in that they are equipped with defeat devices.  These defeat devices are designed to secretly limit emissions and increase fuel efficiency when the vehicles are being subject to regulatory emissions and fuel efficiency testing.  However, when the Fraudulent Vehicles are in regular use on the road, they emit a substantially increased amount of noxious gasses.

306.    As a direct and proximate result of Audi's breach of the implied warranty of merchantability, Plaintiffs have been damaged in an amount to be proven at trial.

**NEW HAMPSHIRE COUNT 3**
**BREACH OF EXPRESS WARRANTY**
**(N.H. Rev. Stat. §§ 382-A:2-313 and 382-A:2A-210)**
**(On Behalf of the New Hampshire Plaintiffs)**

307.    Plaintiffs re-allege and incorporate by reference all preceding allegations as though fully set forth herein.

308.    The Defendants are and were at all relevant times "merchants" with respect to motor vehicles under N.H. Rev. Stat. § 382-A:2-104(1) and "sellers" of motor vehicles under § 382-A:2-103(1)(d).

309.    With respect to leases, the Defendants are and were at all relevant times "lessors" of motor vehicles under N.H. Rev. Stat. § 382-A:2A-103(1)(p).

310.    The Fraudulent Vehicles are and were at all relevant times "goods" within the meaning of N.H. Rev. Stat. §§ 382-A:2-105(1) and  2A-103(1)(h).

311.    As set forth above in detail, the Fraudulent Vehicles are inherently defective in that they are equipped with "defeat devices."  These defeat devices are designed to secretly limit emissions and increase fuel efficiency when the vehicles are being subject to regulatory emissions and fuel efficiency testing. However, when the Fraudulent Vehicles are in regular use on the road, they emit a substantially increased amount of noxious gasses.  The installation of the defeat device substantially impairs the use and value of the Fraudulent Vehicles to reasonable consumers.

312.    As a result of Audi's breach of their express warranties, Plaintiffs received goods whose defect substantially impairs their value to Plaintiffs.  Plaintiffs have been damaged as a result of, inter alia, the diminished value of Audi's products.

313.    As a direct and proximate result of Audi's breach of express warranties, Plaintiffs have been damaged in an amount to be determined at trial.

## NEW JERSEY COUNTS

### NEW JERSEY COUNT 1
### VIOLATIONS OF THE NEW JERSEY CONSUMER FRAUD ACT
#### (N.J. Stat. Ann. §§ 56:8-1, et seq.)
#### (On Behalf of the New Jersey Plaintiffs)

314.    Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

315.    Plaintiffs and Defendants are persons under the New Jersey Consumer Fraud Act, N.J. Stat. § 56:8-1(d).

316.    Audi engaged in "sales" of "merchandise" within the meaning of N.J. Stat. § 56:8-1(c), (e). Audi's actions as set forth herein occurred in the conduct of trade or commerce.

317.    The New Jersey Consumer Fraud Act ("New Jersey CFA") makes unlawful "[t]he act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression, or omission of any material fact with the intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby…" N.J. Stat. § 56:8-2.

318.    In the course of its business, Audi concealed and suppressed material facts concerning the Fraudulent Vehicles.  Defendants accomplished this by installing illegal defeat device software in the Fraudulent Vehicles that caused the vehicles to operate in a low emission test mode only during emissions testing.  During normal operations, the Fraudulent Vehicles would emit grossly larger quantities of noxious $CO_2$ gasses.  The result was what Audi intended—the Fraudulent Vehicles passed emissions testing by way of deliberately induced false readings. Plaintiffs had no way of discerning that Audi's representations were false and

misleading because Audi's defeat device software was extremely sophisticated technology. Plaintiffs did not and could not unravel Audi's deception on their own.

319.   Audi thus violated the Act by, at minimum: employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Fraudulent Vehicles.

320.   Audi intentionally and knowingly misrepresented material facts regarding the Fraudulent Vehicles with intent to mislead Plaintiffs.

321.   Audi knew or should have known that its conduct violated the New Jersey CPA.

322.   Audi owed Plaintiffs a duty to disclose illegality, public health and safety risks, the true nature of the Fraudulent Vehicles and the devaluing of safety at Audi, because Audi:

    a.   possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not comply with regulations;

    b.   intentionally concealed the foregoing from regulators and Plaintiffs,; and/or

    c.    made incomplete representations about the environmental cleanliness and efficiency of the Fraudulent Vehicles generally, and the use of the defeat device in particular, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

323.   Audi's fraudulent use of the "defeat device" and its concealment of the true characteristics of the Fraudulent Vehicles' fuel consumption of $CO_2$ emissions were material to Plaintiffs.

324.    Audi's unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including Plaintiffs.

325.   Plaintiffs suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and its concealment of and failure to disclose material

information. Plaintiffs who purchased or leased the Fraudulent Vehicles would not have purchased or leased them at all and/or—if the Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them. Plaintiffs also suffered diminished value of their vehicles, as well as lost or diminished use.

326.    As a direct and proximate result of Defendants' violations of the New Jersey CPA,

327.    Plaintiffs have suffered injury-in-fact and/or actual damage.

328.    Defendants had an ongoing duty to all Audi customers to refrain from unfair and deceptive practices under the New Jersey CPA in the course of its business.

329.    Defendants' violations present a continuing risk to Plaintiffs as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

330.    As a result of the foregoing wrongful conduct of Defendants, Plaintiffs have been damaged in an amount to be proven at trial, and seek all just and proper remedies, including, but not limited to, actual and statutory damages, treble damages, an order enjoining Defendants' deceptive and unfair conduct, costs and reasonable attorneys' fees under N.J. Stat. § 56:8-19, and all other just and appropriate relief.

**NEW JERSEY COUNT 2**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**(N.J.S. 12A:2-314 and 2A-212)**
**(On Behalf of the New Jersey Plaintiffs)**

331.    Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

332.    The Defendants are and were at all relevant times "merchants" with respect to motor vehicles under N.J.S. 12A:2-104(1) and "sellers" of motor vehicles under 2- 103(1)(d).

333.   With respect to leases, the Defendants are and were at all relevant times "lessors" of motor vehicles under N.J.S. 12A:2A-103(1)(p).

334.   The Fraudulent Vehicles are and were at all relevant times "goods" within the meaning of N.J.S. 12A:2-105(1) and 2A-103(1)(h).

335.   A warranty that the Fraudulent Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to N.J.S. 12A:2-314 and 2A-212.

336.   These Fraudulent Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used.

337.   Specifically, the Fraudulent Vehicles are inherently defective in that they do not comply with federal and state emissions standards, rendering certain emissions functions inoperative; and the vehicle was not adequately designed, manufactured, and tested.

338.   Audi was provided notice of these issues by the investigations of the EPA and individual state regulators, numerous complaints filed against it including the instant Complaint, and by numerous individual letters and communications sent by Plaintiffs and others within a reasonable amount of time after the allegations of Fraudulent Vehicle defects became public.

339.   As a direct and proximate result of the Defendants' breach of the implied warranty of merchantability, Plaintiffs have been damaged in an amount to be proven at trial.

**NEW JERSEY COUNT 3**
**BREACH OF EXPRESS WARRANTY**
**(N.J.S. 12A:2-313 and 2A-210)**
**(On Behalf of the New Jersey Plaintiffs)**

340.   Plaintiffs re-allege and incorporate by reference all preceding allegations as though fully set forth herein.

341.   The Defendants are and were at all relevant times "merchants" with respect to motor vehicles under N.J.S. 12A:2-104(1) and "sellers" of motor vehicles under 2- 103(1)(d).

342.   With respect to leases, the Defendants are and were at all relevant times "lessors" of motor vehicles under N.J.S. 12A:2A-103(1)(p).

343.   The Fraudulent Vehicles are and were at all relevant times "goods" within the meaning of N.J.S. 12A:2-105(1) and 2A-103(1)(h).

344.   As set forth above in detail, the Fraudulent Vehicles are inherently defective in that they are equipped with "defeat devices."  These defeat devices are designed to secretly limit emissions and increase fuel efficiency when the vehicles are being subject to regulatory emissions and fuel efficiency testing. However, when the Fraudulent Vehicles are in regular use on the road, they emit a substantially increased amount of noxious gasses.  The installation of the defeat device substantially impairs the use and value of the Fraudulent Vehicles to reasonable consumers.

345.   As a result of Audi's breach of their express warranties, Plaintiffs received goods whose defect substantially impairs their value to Plaintiffs.  Plaintiffs have been damaged as a result of, inter alia, the diminished value of Audi's products.

346.   As a direct and proximate result of Audi's breach of express warranties, Plaintiffs have been damaged in an amount to be determined at trial.

## NEW MEXICO COUNTS

### NEW MEXICO COUNT 1
### VIOLATIONS OF THE NEW MEXICO UNFAIR TRADE PRACTICES ACT
### (N.M. Stat. Ann. §§ 57-12-1, et seq.)
### (On Behalf of the New Mexico Plaintiffs)

347.     Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

348.     Audi and Plaintiffs or were "person[s]" under the New Mexico Unfair Trade Practices Act ("New Mexico UTPA"), N.M. STAT. ANN. § 57-12-2.

349.     Audi's actions as set forth herein occurred in the conduct of trade or commerce as defined under N.M. STAT. ANN. § 57-12-2.

350.     The New Mexico UTPA makes unlawful "a false or misleading oral or written statement, visual description or other representation of any kind knowingly made in connection with the sale, lease, rental or loan of goods or services … by a person in the regular course of the person's trade or commerce, that may, tends to or does deceive or mislead any person," including but not limited to "failing to state a material fact if doing so deceives or tends to deceive."  N.M. STAT. ANN. § 57-12-2(D). Audi's acts and omissions described herein constitute unfair or deceptive acts or practices under N.M. STAT. ANN. § 57-12-2(D). In addition, Audi's actions constitute unconscionable actions under N.M. STAT. ANN. § 57-12-2(E), since they took advantage of the lack of knowledge, ability, experience, and capacity of Plaintiffs to a grossly unfair degree.

351.     In the course of its business, Audi concealed and suppressed material facts concerning the Fraudulent Vehicles.  Defendants accomplished this by installing illegal defeat device software in the Fraudulent Vehicles that caused the vehicles to operate in a low emission test mode only during emissions testing.  During normal operations, the Fraudulent Vehicles

would emit grossly larger quantities of noxious $CO_2$ gasses.  The result was what Audi intended—the Fraudulent Vehicles passed emissions testing by way of deliberately induced false readings. Plaintiffs had no way of discerning that Audi's representations were false and misleading because Audi's defeat device software was extremely sophisticated technology. Plaintiffs did not and could not unravel Audi's deception on their own.

352.    Audi thus violated the Act by, at minimum: employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Fraudulent Vehicles.

353.    Audi intentionally and knowingly misrepresented material facts regarding the Fraudulent Vehicles with intent to mislead Plaintiffs.

354.    Audi knew or should have known that its conduct violated the New Mexico UTPA.

355.    Audi owed Plaintiffs a duty to disclose illegality, public health and safety risks, the true nature of the Fraudulent Vehicles and the devaluing of safety at Audi, because Audi:

a.      possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not comply with regulations;

b.      intentionally concealed the foregoing from regulators and Plaintiffs,; and/or

c.      made incomplete representations about the environmental cleanliness and efficiency of the Fraudulent Vehicles generally, and the use of the defeat device in particular, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

356.    Audi's fraudulent use of the "defeat device" and its concealment of the true characteristics of the Fraudulent Vehicles' fuel consumption of $CO_2$ emissions were material to Plaintiffs.

357.    Audi's unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including Plaintiffs.

358.    Plaintiffs suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and its concealment of and failure to disclose material information. Plaintiffs who purchased or leased the Fraudulent Vehicles would not have purchased or leased them at all and/or—if the Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them. Plaintiffs also suffered diminished value of their vehicles, as well as lost or diminished use.

359.    As a direct and proximate result of Defendants' violations of the New Mexico UTPA, Plaintiffs have suffered injury-in-fact and/or actual damage.

360.    Plaintiffs seek punitive damages against Audi because Audi's conduct was malicious, willful, reckless, wanton, fraudulent and in bad faith.

361.    Because Audi's conduct was malicious, willful, reckless, wanton, fraudulent and in bad faith, it warrants punitive damages.

362.    Because Audi's unconscionable, willful conduct caused actual harm to Plaintiffs, Plaintiffs seek recovery of actual damages or $100, whichever is greater, discretionary treble damages, punitive damages, and reasonable attorneys' fees and costs, as well as all other proper and just relief available under N.M. STAT. ANN. § 57- 12-10.

### NEW MEXICO COUNT 2
### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (N.M. Stat. §§ 55-2-314 and 55-2A-212)
### (On Behalf of the New Mexico Plaintiffs)

363.    Plaintiffs re-allege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

364.   The Defendants are and were at all relevant times "merchants" with respect to motor vehicles under N.M. Stat. § 55-2-104(1) and "sellers" of motor vehicles under § 55-2-103(1)(d).

365.   With respect to leases, the Defendants are and were at all relevant times "lessors" of motor vehicles under N.M. Stat. § 55-2A-103(1)(p).

366.   The Fraudulent Vehicles are and were at all relevant times "goods" within the meaning of N.M. Stat. §§ 55-2-105(1) and 55-2A-103(1)(h).

367.   A warranty that the Fraudulent Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to N.M. Stat. §§ 55-2- 314 and 55-2A-212.

368.   The Fraudulent Vehicles were not in merchantable condition and were not fit for ordinary vehicles are used because they share a common defect in that they are equipped with defeat devices.  These defeat devices are designed to secretly limit emissions and increase fuel efficiency when the vehicles are being subject to regulatory emissions and fuel efficiency testing. However, when the Fraudulent Vehicles are in regular use on the road, they emit a substantially increased amount of noxious gasses.

369.   As a direct and proximate result of Audi's breach of the implied warranty of merchantability, Plaintiffs have been damaged in an amount to be proven at trial.

**NEW MEXICO COUNT 3**
**BREACH OF EXPRESS WARRANTY**
**(N.M. Stat. §§ 55-2-313 and 55-2A-210)**
**(On Behalf of the New Mexico Plaintiffs)**

370.   Plaintiffs re-allege and incorporate by reference all preceding allegations as though fully set forth herein.

371.   The Defendants are and were at all relevant times "merchants" with respect to motor vehicles under N.M. Stat. § 55-2-104(1) and "sellers" of motor vehicles under § 55-2-103(1)(d).

372.   With respect to leases, the Defendants are and were at all relevant times "lessors" of motor vehicles under N.M. Stat. § 55-2A-103(1)(p).

373.   The Fraudulent Vehicles are and were at all relevant times "goods" within the meaning of N.M. Stat. §§ 55-2-105(1) and 55-2A-103(1)(h).

374.   As set forth above in detail, the Fraudulent Vehicles are inherently defective in that they are equipped with "defeat devices."  These defeat devices are designed to secretly limit emissions and increase fuel efficiency when the vehicles are being subject to regulatory emissions and fuel efficiency testing. However, when the Fraudulent Vehicles are in regular use on the road, they emit a substantially increased amount of noxious gasses.  The installation of the defeat device substantially impairs the use and value of the Fraudulent Vehicles to reasonable consumers.

375.   As a result of Audi's breach of their express warranties, Plaintiffs received goods whose defect substantially impairs their value to Plaintiffs.  Plaintiffs have been damaged as a result of, inter alia, the diminished value of Audi's products.

376.   As a direct and proximate result of Audi's breach of express warranties, Plaintiffs have been damaged in an amount to be determined at trial.

**NEW YORK COUNTS**

**NEW YORK COUNT 1**
**VIOLATIONS OF NEW YORK GENERAL BUSINESS LAW § 349**
**(N.Y. Gen. Bus. Law § 349)**
**(On Behalf of the New York Plaintiffs)**

377.    Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

378.    Plaintiffs and all Defendants are "persons" under N.Y.    Gen. Bus. Law § 349(h), the New York Deceptive Acts and Practices Act ("NY DAPA"). Defendants' actions as set forth herein occurred in the conduct of trade or commerce under the NY DAPA.

379.    The NY DAPA makes unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce." N.Y. Gen. Bus. Law § 349.  Defendants' conduct, as set forth herein, constitutes deceptive acts or practices under this section.

380.    In the course of its business, Audi concealed and suppressed material facts concerning the Fraudulent Vehicles.  Defendants accomplished this by installing illegal defeat device software in the Fraudulent Vehicles that caused the vehicles to operate in a low emission test mode only during emissions testing.  During normal operations, the Fraudulent Vehicles would emit grossly larger quantities of noxious $CO_2$ gasses.  The result was what Audi intended—the Fraudulent Vehicles passed emissions testing by way of deliberately induced false readings. Plaintiffs had no way of discerning that Audi's representations were false and misleading because Audi's defeat device software was extremely sophisticated technology. Plaintiffs did not and could not unravel Audi's deception on their own.

381.    Audi thus violated the Act by, at minimum: employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material

fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Fraudulent Vehicles.

382.   Audi intentionally and knowingly misrepresented material facts regarding the Fraudulent Vehicles with intent to mislead Plaintiffs.

383.   Audi knew or should have known that its conduct violated the NY DAPA.

384.   Audi owed Plaintiffs a duty to disclose illegality, public health and safety risks, the true nature of the Fraudulent Vehicles and the devaluing of safety at Audi, because Audi:

   a.   possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not comply with regulations;

   b.   intentionally concealed the foregoing from regulators and Plaintiffs,; and/or

   c.   made incomplete representations about the environmental cleanliness and efficiency of the Fraudulent Vehicles generally, and the use of the defeat device in particular, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

385.   Audi's fraudulent use of the "defeat device" and its concealment of the true characteristics of the Fraudulent Vehicles' fuel consumption of $CO_2$ emissions were material to Plaintiffs.

386.   Audi's unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including Plaintiffs.

387.   Plaintiffs suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and its concealment of and failure to disclose material information. Plaintiffs who purchased or leased the Fraudulent Vehicles would not have purchased or leased them at all and/or—if the Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them. Plaintiffs also suffered diminished value of their vehicles, as well as lost or diminished use.

388.   As a direct and proximate result of Defendants' violations of the NY DAPA,

389.   Plaintiffs have suffered injury-in-fact and/or actual damage.

390.   Audi's violations of the NY DAPA present a continuing risk to Plaintiffs and to the general public. Audi's deceptive acts and practices affect the public interest.

391.   As a result of the foregoing willful, knowing, and wrongful conduct of Defendants, Plaintiffs have been damaged in an amount to be proven at trial, and seek all just and proper remedies, including but not limited to actual damages or $50, whichever is greater, treble damages up to $1,000, punitive damages to the extent available under the law, reasonable attorneys' fees and costs, an order enjoining Defendants' deceptive and unfair conduct, and all other just and appropriate relief available under the NY DAPA.

**NEW YORK COUNT 2**
**VIOLATIONS OF NEW YORK GENERAL BUSINESS LAW § 350**
**(N.Y. Gen. Bus. Law § 350)**
**(On Behalf of the New York Plaintiffs)**

392.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

393.   Defendants were engaged in the "conduct of business, trade or commerce," within the meaning of N.Y. Gen. Bus. Law § 350, the New York False Advertising Act ("NY FAA")

394.   The NY FAA makes unlawful "[f]alse advertising in the conduct of any business, trade or commerce." N.Y. Gen. Bus. Law § 350.  False advertising includes "advertising, including labeling, of a commodity . . . if such advertising is misleading in a material respect," taking into account "the extent to which the advertising fails to reveal facts material in light of … representations [made] with respect to the commodity …." N.Y. Gen. Bus. Law § 350-a.

395.   Audi caused to be made or disseminated through New York, through advertising, marketing, and other publications, statements and omissions that were untrue or misleading, and

that were known by Audi, or that through the exercise of reasonable care should have been known by Audi, to be untrue and misleading to Plaintiffs.

396.    Audi made numerous material misrepresentations and omissions of fact with intent to mislead and deceive concerning the Fraudulent Vehicles, particularly concerning the illegality, efficacy and functioning of the emissions systems on vehicles.

397.    Specifically, Audi intentionally concealed and suppressed material facts concerning the legality and quality of the Fraudulent Vehicles in order to intentionally and grossly defraud and mislead the Plaintiffs concerning the true emissions produced by the engines in the Fraudulent Vehicles.

398.    The misrepresentations and omissions regarding set forth above were material and likely to deceive a reasonable consumer. Specifically, although Audi advertised the Fraudulent Vehicles as clean and environmentally-friendly, they in fact used a sophisticated defeat device that was undetectable to the ordinary consumer that made them non-compliant with EPA emission regulations.

399.    Audi intentionally and knowingly misrepresented material facts regarding the Fraudulent Vehicles with intent to mislead Plaintiffs.

400.    Audi's false advertising was likely to and did in fact deceive regulators and reasonable consumers, including Plaintiffs, about the illegality and true characteristics of the Fraudulent vehicles, the quality of the Audi brand and the true value of the Fraudulent Vehicles.

401.    Audi's violations of the NY FAA present a continuing risk to Plaintiffs and to the general public. Audi's deceptive acts and practices affect the public interest.

402.    The Fraudulent Vehicles do not perform as advertised and are not compliant with EPA regulations, making them far less valuable than advertised.

403.    Plaintiffs who purchased Fraudulent Vehicles either would not have purchased them at all or paid less but for Audi's false advertising in violation of the NY FAA. Plaintiffs who leased Fraudulent Vehicles either would not have leased them at all, or at a lower rate but for Audi's false advertising in violation of the NY FAA.

404.    The Plaintiffs have suffered injury-in-fact and/or actual damages and ascertainable loss as a direct and proximate result of the Defendant's false advertising in violation of the NY FAA, including but not limited to purchasing or leasing an illegal vehicle, diminished or complete lost value for the Fraudulent Vehicles they purchased or leased; lost or diminished use, enjoyment and utility of such vehicles; and annoyance, aggravation and inconvenience resulting from Defendant's violations of the NY FAA.

405.    Plaintiffs seek monetary relief against Defendants measured as the greater of (a) actual damages in an amount to be determined at trial, and (b) statutory damages in the amount of $500.  Because Audi's conduct was committed willingly and knowingly, Plaintiffs are entitled to recover three times actual damages, up to $10,000.

406.    Plaintiffs also seek an order enjoining Audi's false advertising, attorneys' fees, and any other just and proper relief under N.Y. Gen. Bus. Law § 350.

**NEW YORK COUNT 3**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**(N.Y. U.C.C. Law §§ 2-314 and 2A-212)**
**(On Behalf of the New York Plaintiffs)**

407.    Plaintiffs re-allege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

408.    The Defendants are and were at all relevant times "merchants" with respect to motor vehicles under N.Y. UCC Law § 2-104(1) and "sellers" of motor vehicles under § 2-103(1)(d).

409.    With respect to leases, the Defendants are and were at all relevant times "lessors" of motor vehicles under N.Y. UCC Law § 2A-103(1)(p).

410.    The Fraudulent Vehicles are and were at all relevant times "goods" within the meaning of N.Y. UCC Law §§ 2-105(1) and 2A-103(1)(h).

411.    A warranty that the Fraudulent Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to N.Y. UCC Law §§ 2- 314 and 2A-212.

412.    The Fraudulent Vehicles were not in merchantable condition and were not fit for ordinary vehicles are used because they share a common defect in that they are equipped with defeat devices.  These defeat devices are designed to secretly limit emissions and increase fuel efficiency when the vehicles are being subject to regulatory emissions and fuel efficiency testing. However, when the Fraudulent Vehicles are in regular use on the road, they emit a substantially increased amount of noxious gasses.

413.    As a direct and proximate result of Audi's breach of the implied warranty of merchantability, Plaintiffs have been damaged in an amount to be proven at trial.

**NEW YORK COUNT 4**
**BREACH OF EXPRESS WARRANTY**
**(N.Y. U.C.C. Law §§ 2-313 and 2A-210)**
**(On Behalf of the New York Plaintiffs)**

414.    Plaintiffs re-allege and incorporate by reference all preceding allegations as though fully set forth herein.

415.    The Defendants are and were at all relevant times "merchants" with respect to motor vehicles under N.Y. UCC Law § 2-104(1) and "sellers" of motor vehicles under § 2-103(1)(d).

416.    With respect to leases, the Defendants are and were at all relevant times "lessors" of motor vehicles under N.Y. UCC Law § 2A-103(1)(p).

417.    The Fraudulent Vehicles are and were at all relevant times "goods" within the meaning of N.Y. UCC Law §§ 2-105(1) and 2A-103(1)(h).

418.    As set forth above in detail, the Fraudulent Vehicles are inherently defective in that they are equipped with "defeat devices."  These defeat devices are designed to secretly limit emissions and increase fuel efficiency when the vehicles are being subject to regulatory emissions and fuel efficiency testing. However, when the Fraudulent Vehicles are in regular use on the road, they emit a substantially increased amount of noxious gasses.  The installation of the defeat device substantially impairs the use and value of the Fraudulent Vehicles to reasonable consumers.

419.    As a result of Audi's breach of their express warranties, Plaintiffs received goods whose defect substantially impairs their value to Plaintiffs.  Plaintiffs have been damaged as a result of, inter alia, the diminished value of Audi's products.

420.    As a direct and proximate result of Audi's breach of express warranties, Plaintiffs have been damaged in an amount to be determined at trial.

## NORTH CAROLINA COUNTS

### NORTH CAROLINA COUNT 1
### VIOLATIONS OF THE NORTH CAROLINA UNFAIR
### AND DECEPTIVE TRADE PRACTICES ACT
### (N.C. Gen. Stat. §§ 75-1.1, et seq.)
### (On Behalf of the North Carolina Plaintiffs)

421.    Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

422.     Plaintiffs are persons under the North Carolina Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. §§ 75-1.1, et seq. ("NCUDTPA").

423.     Audi's acts and practices complained of herein were performed in the course of Audi's trade or business and thus occurred in or affected "commerce," as defined in N.C. Gen. Stat. § 75-1.1(b).

424.     The NCUDTPA makes unlawful "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce[.]" The NCUDTPA provides a private right of action for any person injured "by reason of any act or thing done by any other person, firm or corporation in violation of" the NCUDTPA.  N.C. Gen. Stat. § 75-16.

425.     In the course of its business, Audi concealed and suppressed material facts concerning the Fraudulent Vehicles.  Defendants accomplished this by installing illegal defeat device software in the Fraudulent Vehicles that caused the vehicles to operate in a low emission test mode only during emissions testing.  During normal operations, the Fraudulent Vehicles would emit grossly larger quantities of noxious $CO_2$ gasses.  The result was what Audi intended—the Fraudulent Vehicles passed emissions testing by way of deliberately induced false readings. Plaintiffs had no way of discerning that Audi's representations were false and misleading because Audi's defeat device software was extremely sophisticated technology. Plaintiffs did not and could not unravel Audi's deception on their own.

426.     Audi thus violated the Act by, at minimum: employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Fraudulent Vehicles.

427.   Audi intentionally and knowingly misrepresented material facts regarding the Fraudulent Vehicles with intent to mislead Plaintiffs.

428.   Audi knew or should have known that its conduct violated the NCUDTPA.  Audi owed Plaintiffs a duty to disclose illegality, public health and safety risks, the true nature of the Fraudulent Vehicles and the devaluing of safety at Audi, because Audi:

    a.   possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not comply with regulations;

    b.   intentionally concealed the foregoing from regulators and Plaintiffs,; and/or

    c.   made incomplete representations about the environmental cleanliness and efficiency of the Fraudulent Vehicles generally, and the use of the defeat device in particular, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

429.   Audi's fraudulent use of the "defeat device" and its concealment of the true characteristics of the Fraudulent Vehicles' fuel consumption of $CO_2$ emissions were material to Plaintiffs.

430.   Audi's unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including Plaintiffs.

431.   Plaintiffs suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and its concealment of and failure to disclose material information. Plaintiffs who purchased or leased the Fraudulent Vehicles would not have purchased or leased them at all and/or—if the Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them. Plaintiffs also suffered diminished value of their vehicles, as well as lost or diminished use.

432.   As a direct and proximate result of Defendants' violations of the NCUDTPA,

433.   Plaintiffs have suffered injury-in-fact and/or actual damage.

434.    Defendants had an ongoing duty to all Audi customers to refrain from unfair and deceptive practices under the North Carolina CPA in the course of its business.

435.    Defendants' violations present a continuing risk to Plaintiffs as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

436.    As a result of the foregoing wrongful conduct of Defendants, Plaintiffs have been damaged in an amount to be proven at trial, and seek all just and proper remedies, including but not limited to treble damages, an order enjoining Defendants' deceptive and unfair conduct, court costs and reasonable attorneys' fees, and any other just and proper relief available under N.C. Gen. Stat. § 75-16.

**NORTH CAROLINA COUNT 2**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**(N.C.G.S.A. §§ 25-2-314 and 252A-212)**
**(On Behalf of the North Carolina Plaintiffs)**

437.    Plaintiffs re-allege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

438.    The Defendants are and were at all relevant times "merchants" with respect to motor vehicles under N.C.G.S.A. § 25-2-104(1) and "sellers" of motor vehicles under § 25-2-103(1)(d).

439.    With respect to leases, the Defendants are and were at all relevant times "lessors" of motor vehicles under N.C.G.S.A. § 25-2A-103(1)(p).

440.    The Fraudulent Vehicles are and were at all relevant times "goods" within the meaning of N.C.G.S.A. § 25-2-105(1) and N.C.G.S.A. § 25-2A-103(1)(h).5.

441.    A warranty that the Fraudulent Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to N.C.G.S.A. § 25-2-314 and N.C.G.S.A. § 25-2A-212.

442.    The Fraudulent Vehicles were not in merchantable condition and were not fit for ordinary vehicles are used because they share a common defect in that they are equipped with defeat devices.  These defeat devices are designed to secretly limit emissions and increase fuel efficiency when the vehicles are being subject to regulatory emissions and fuel efficiency testing. However, when the Fraudulent Vehicles are in regular use on the road, they emit a substantially increased amount of noxious gasses.

443.    As a direct and proximate result of Audi's breach of the implied warranty of merchantability, Plaintiffs have been damaged in an amount to be proven at trial.

### NORTH CAROLINA COUNT 3
### BREACH OF EXPRESS WARRANTY
### (N.C.G.S.A. §§ 25-2-313 and 252A-210)
### (On Behalf of the North Carolina Plaintiffs)

444.    Plaintiffs re-allege and incorporate by reference all preceding allegations as though fully set forth herein.

445.    The Defendants are and were at all relevant times "merchants" with respect to motor vehicles under N.C.G.S.A. § 25-2-104(1) and "sellers" of motor vehicles under § 25-2-103(1)(d).

446.    With respect to leases, the Defendants are and were at all relevant times "lessors" of motor vehicles under N.C.G.S.A. § 25-2A-103(1)(p).

447.    The Fraudulent Vehicles are and were at all relevant times "goods" within the meaning of N.C.G.S.A. § 25-2-105(1) and N.C.G.S.A. § 25-2A-103(1)(h).

448.     As set forth above in detail, the Fraudulent Vehicles are inherently defective in that they are equipped with "defeat devices."  These defeat devices are designed to secretly limit emissions and increase fuel efficiency when the vehicles are being subject to regulatory emissions and fuel efficiency testing. However, when the Fraudulent Vehicles are in regular use on the road, they emit a substantially increased amount of noxious gasses.  The installation of the defeat device substantially impairs the use and value of the Fraudulent Vehicles to reasonable consumers.

449.     As a result of Audi's breach of their express warranties, Plaintiffs received goods whose defect substantially impairs their value to Plaintiffs.  Plaintiffs have been damaged as a result of, inter alia, the diminished value of Audi's products.

450.     As a direct and proximate result of Audi's breach of express warranties, Plaintiffs have been damaged in an amount to be determined at trial.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request this Court:

A.     Award damages, including compensatory and exemplary damages, to Plaintiffs;

B.     Award Plaintiffs actual damages sustained;

C.     Award Plaintiffs such additional damages, over and above the amount of their actual damages, that are authorized and warranted by law, applicable;

D.     Grant restitution to Plaintiffs and require Defendants to disgorge inequitable gains;

E.     Grant appropriate injunctive and/or declaratory relief, including, without limitation, an order that requires Defendants to repair, recall, and/or replace the Fraudulent Vehicles and to extend the applicable warranties to a reasonable

period of time, or, at a minimum, to provide Plaintiffs with appropriate curative notice regarding the existence and cause of the defect;

F.     Award Plaintiffs punitive damages;

G.     Award Plaintiffs their reasonable attorneys' fees and reimbursement of all costs for the prosecution of this action; and

H.     Award such other relief as this Court deems just and appropriate.

## **JURY DEMAND**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs hereby demand a trial by jury on all issues so triable.

DATED:  April 27, 2017

HEYGOOD, ORR & PEARSON

By: /s/ *Michael E. Heygood*
MICHAEL E. HEYGOOD,
PSC Member/MDL No. 2672-CRB
Texas Bar No. 00784267
CHARLES MILLER,
ESQ./SBN: 276523
**HEYGOOD, ORR & PEARSON**
6363 North State Highway 161
Suite 450
Irving, Texas 75038
Telephone: (214) 237-9001
Facsimile: (214) 237-9002

Admission *Pro Hac Vice*
to be Sought for:

ERIC D. PEARSON,
Texas Bar No. 15690472
**HEYGOOD, ORR & PEARSON**
6363 North State Highway 161
Suite 450
Irving, Texas 75038
Telephone: (214) 237-9001
Facsimile: (214) 237-9002

**Attorney for Plaintiffs**